Stanley R. Apps (State Bar No. 309425)
4424 Bellingham Avenue
Studio City, CA 91604
Telephone: (310) 709-3966
E-mail: stan@appsatlaw.com

Of Counsel to
CREDIT REPAIR LAWYERS OF AMERICA
39111 Six Mile Road, Suite 142,
Livonia, MI 48152
Telephone: (248) 353-2882
Facsimile: (248) 353-4840

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

BRIAN HOROWITZ,

Plaintiff,

vs.

CHEX SYSTEMS, INC., et al.,

Defendants.

Case No.: 8:22-cv-02002-DFM

**PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS**

PLAINTIFF, THROUGH COUNSEL, STANLEY R. APPS, in support of his Motion for Partial Summary Judgment, hereby relies upon the following Statement of Uncontroverted Facts:

1. On April 14, 2023, Plaintiff filed his First Amended Complaint against the Defendants for negligent and willful violations of the Fair Credit Reporting Act. Dkt 31, Claims 1-4. This is the operative complaint in this action.
2. In 2018, Plaintiff Brian Horowitz ("Plaintiff" or "Horowitz"), was the Chief Executive Officer of an entity called COD USA, INC. ("COD"). Ex 1- 26:3-10
3. Horowitz never owned any interest of COD USA, Inc. Ex 1 - 26:3-10.
4. COD USA, Inc. was owned 100% by Heather Smulson. Ex1 - 35:20-22.
5. In 2018, COD USA Inc. had a business bank account at Union Bank (now it is part of U.S. Bank). Ex 3.
6. On January 16, 2018, the following events took place:
    a. COD's account at Union Bank was served with an out of state garnishment order for $115,000. Ex 4
    b. Union Bank's Legal Department froze COD's bank account. Ex 2 - 13:9-12
    c. COD's office manager, Barbara Tolbert purchased a Cashier's Check ("the Check") with funds from COD's account at Union Bank. Ex 1 25:14-19.

d. In order to purchase the Check, Union Bank's employee, Kyle Connors lifted the freeze on the Account and issued the $70,000 cashier's check payable to Horowitz. Ex 2 – 48:4-6.

e. Horowitz deposited the Check into his personal account at Bank of America, with the last four digits of 2815 ("Account 2815"). Ex 5.

7. Horowitz's Account 2815 was a personal bank account. Ex 6 50:10.

8. The face of the Check identifies the "remitter" as COD USA, Inc. Ex 7.

9. At the time Horowitz deposited the Check into Account 2815, he also had another account at BOA ending in 6656 ("Account 6656"), which was a business account. Ex 8 28:12-23.

10. Shortly after he deposited the Check into Account 2815, he made several distributions out of that account, believing the Check would be honored by Union Bank. Ex 9.

11. On January 17, 2018, Union Bank's Kyle Connors learned that his employer's Legal Department had frozen the account and contacted Union Bank's Reconciliation Department for authorization to issue a stop payment order on the Check. Ex 2 13:9-12.

12. On January 18, 2018, Horowitz noticed that his Account 2815 at BOA had not been credited for the $70,000 Check. This caused Horowitz to send an email to Mr.

Connors. Connors replied to Horowitz stating that "*The funds leave the account as soon as the check is issued at the branch. There is still a processing time once it is deposited. I will speak with my service manager about it once she is back from her meeting this afternoon and get back to you with an update as soon as I have one.* Ex 10.

13. Connors knew, at the time that he responded to Horowitz's email, that Union Bank had issued a stop payment on the Check, but purposefully failed to inform Horowitz that it had done so. Ex 2 52:21 – 53:18.

**UNION BANK'S ISSUANCE OF A STOP PAYMENT ORDER ON ITS OWN CERTIFIED CHECK CAUSED HOROWITZ TO OVERDRAFT HIS PERSONAL ACCOUNT 2815 AT BANK OF AMERICA**

14. Union Bank's FRCP 30(b)(6) witness, Julie Biszantz ("Biszantz") testified that Kyle Connors from Union Bank had requested the stop payment order on the Check when he learned that Union Bank's Legal Department had frozen the COD account. Ex 2 26:9-11.

15. Biszantz also testified that Horowitz played no role in causing Union Bank to issue a stop payment order on the Check. Ex 2 64:2-14.

16. Horowitz was not even notified by Union Bank of its intention to issue the stop payment order before it had done so. Ex 2 63:10-12.

17. Resultantly, by February 5, 2018, Horowitz's personal account at Bank of America, Account 2815 was overdrawn by $69,316.08. Ex 9.

## BANK OF AMERICA PERFORMS AN INITIAL INVESTIGATION WHICH PRE-DATES ANY FCRA REINVESTIGATIONS REQUIRED

~~17.~~18. Christopher Thompson ("Thompson") from BOA's Fraud Team, was assigned to conduct the initial investigation into Horowitz and the overdraft of Account 2815. Ex 6 72:7-15.

~~18.~~19. The Fraud Team at BOA receives referrals from the Overdraft Collections Department when the latter is unsuccessful at collecting accounts that are over drafted. Ex 6 63:7-12.

~~19.~~20. Horowitz had explained to Thompson that Horowitz did not stop payment on the Check. Ex 12.

~~20.~~21. Thompson testified that he was informed by Union Bank that the "remitter" stopped payment on the Check. Ex 6 43:9-10.

~~21.~~22. Thompson incorrectly believed that Horowitz was the remitter, even though the face of the Check shows that COD was the remitter. Ex 7 and Ex 6 62:5-13.

~~22.~~23. Thompson did not know whether Horowitz or Union Bank issued the stop payment order. Ex 6 43:12 – 44:2.

~~23.~~24. Thompson also incorrectly assumed that Horowitz owned COD USA, Inc. Ex 6 62:5-13.

~~24.~~25. The only information that Thompson ever had that Horowitz had engaged in suspected fraud activity was the information he received from Union Bank which "referred" him "to the remitter of the Check." Ex 6 81:22 – 82:11.

~~25.~~26. Horowitz never owned any interest in COD. Ex 1 25:8-13, 26:3-10.

~~26.~~27. Nevertheless, Thompson chose to report Horowitz to Chex as having engaged in Suspected Fraud Activity because Union Bank had informed him that the "remitter" stopped payment on the Check, and because he believed that Horowitz owned COD USA, Inc. Ex 6 61:25- 62:13.

**UNION BANK FINALLY HONORS ITS OWN CERTIFIED CHECK AND PAYS BANK OF AMERICA THE FULL $70,000 ON JUNE 1, 2018**

~~27.~~28. Thompson knew that BOA was a Holder in Due Course as soon as the Check was deposited into Acct 2815 on January 16, 2018. Ex 6 67:9-10.

~~28.~~29. Thompson asserted the Bank's rights as Holder in Due Course to Union Bank and demanded payment on the Check. Ex 12 and Ex 6 68:2-7.

~~29.~~30. On May 22, 2018, BOA closed Horowitz's accounts including Account 2815 and Account 6566. Ex 6 46:1-6.

~~30.~~31. Starting on May 25, 2018, BOA reported Horowitz to Chex as having engaged in "Suspected Fraud Activity" related to Account 2815. (Ex 13 – Q and A 2).

~~31.~~32. Union Bank ultimately made the Check good and paid the $70,000 to Bank of America on June 1, 2018. Ex 6 55:20-21 and Ex 14, p 2.

**Horowitz's First Dispute to the Suspected Fraud Activity item reported by Bank of America to Chex System results in no reinvestigation by Chex System.**

~~32.~~33. On July 28, 2021, Mr. Horowitz's account at Orange County Credit Union was closed due the reporting of Suspected Fraud Activity by BOA. Ex 15

~~33.~~34. On August 17, 2021, Horowitz disputed the reporting of Suspected Fraud Activity by BOA with Chex which caused Chex to create and send a Request for Reinvestigation to BOA. Ex 16.

~~34.~~35. In his First Dispute to Chex, Horowitz informed Chex that he did not cause the stop payment order to be issued on the Check. Ex 16.

~~35.~~36. Chex Systems FRCP 30(b)(6) witness, Ms. Sarah Cables, is familiar with Chex policies and procedures related to reinvestigations. Ex 17 14:6-15. She deposed as follows:

a. Chex reports are used by financial institutions that offer deposit accounts for consumers. Ex 17 17:15-20.

b. BOA only reported Account 2815 to Chex and no other account related to Horowitz; Ex 17 22:9-16.

c. A user of a Chex report who sees that a consumer is reported for "suspected fraud activity" is less likely to open an account for a consumer. Ex 17 26:8-13.

d. Having the flag of "suspected fraud activity" on a consumer's credit report is a very serious notation; Ex 17 28:5-9.

e. Chex had no reason to doubt Mr. Horowitz's allegation that he had nothing to do with stopping payment on the Check; Ex 17 31:13-16.

f. Chex admitted that an important, if not a critical factor to determining whether Horowitz should have been reported as having engaged in Suspected Fraud Activity is ascertaining who stopped payment on the Check. Ex 17 57:11 – 58:6.

g. Chex also admitted that if, in fact, if Horowitz did not stop payment on the Check, he should NOT have been reported as having engaged in Suspected Fraud Activity. Ex 17 61:17 – 62:14.

h. Chex did not investigate the question of who stopped payment on the Check. Ex 17 46:20 – 47:8.

i. Chex had no knowledge of who stopped payment on the Check. Ex 17 45:13-17.

j. In response to the Chex Request for Reinvestigation, Bank of America confirmed its earlier reporting of Horowitz having engaged in Suspected Fraud Activity. Ex 16.

k. Chex merely relied upon what it was told by BOA in confirming the flag of "suspected fraud activity" about Horowitz. Ex 17 48:19-25.

l. Chex put the responsibility of verifying the accuracy and completeness of what Chex reports solely onto the furnisher. Ex 17 46:20 – 47:8.

m. Chex admitted that the extent of its reinvestigation into Horowitz's dispute that he engaged in suspected fraud activity, was to merely send a request for investigation and rely on the answer provided by Carly Adams. Ex 18 40:3-11.

n. If a consumer disputes information, Chex merely double checks with Bank of America to make sure that it is accurate. Ex 18 48:22-25.

**BANK OF AMERICA FAILED TO PERFORM ANY REINVESTIGATION IN RESPONSE TO HOROWITZ'S FIRST DISPUTE.**

~~36.~~37. Horowitz's First Dispute to Chex was received and responded to by Carly Adams at Bank of America. Ex 16

~~37.~~38. Adams has no idea what "suspected fraud activity" means in a Chex report. Ex 18 29:11-13.

~~38.~~39. She did not know what fraud was committed that caused BOA to close Horowitz's account. Ex 18 30:22-23.

~~39.~~40. She did not even know what behavior caused the Bank to report Horowitz for suspected fraud activity. Ex 18 32:8-10.

~~40.~~41. She had no personal knowledge of Horowitz engaging in any fraud activity. Ex 18 48:12-16.

~~41.~~42. She did not know who stopped payment on the Check. Ex 18 25:5-7.

~~42.~~43. Despite not knowing any of these things, she confirmed to Chex, in response to Plaintiff's First Dispute to Chex, that BOA was accurately reporting Horowitz for suspected fraud activity, all the same. Ex 18 33:2-4.

~~43.~~44. The Bank's RISC Department provided the information that caused Adams to confirm that Horowitz had engaged in suspected fraud activity. Ex 18 41:15-21.

~~44.~~45. Adams filled in the Request for Investigation form based solely on what she was told by the RISC Department. Ex 18 49:20 – 50:11.

~~45.~~46. Adams candidly admitted that what the RISC Department had informed her of was not sufficient to tell her that the account should have been closed due to suspected fraud activity. Ex 18 50:13-18.

**BANK OF AMERICA'S POLICIES AND PROCEDURES PREVENT IT FROM CONDUCTING A REASONABLE REINVESTIGATION.**

~~46.~~47. Kevin Williams, another FRCP 30(b)(6) witness for Bank of America, testified as to the reinvestigations performed by BOA.

~~47.~~48. Williams testified that the RISC Department makes the finding of suspected fraud activity on Chex Reports. Ex 19 29:13-19.

~~48.~~49. Williams did not know if Horowitz had engaged in any fraud. Ex 19 41:22-23.

~~49.~~50. The Bank's process for conducting reinvestigations in response to consumer disputes is only triggered if new information is provided in connection with the consumer's dispute. Ex 19 46:5-8.

~~50.~~51. Because there was no new information provided by Horowitz, the Bank's policies and procedures are very clear for them (the investigators of Plaintiff's First and Second Disputes to Chex) "to hold the original decision." Ex 19 47:3-9.

~~51.~~52. Williams testified "the Bank's policy for reinvestigations (under the FCRA) is only to "investigate the reasonableness of the investigation." Ex 19 47:3-9

**BANK OF AMERICA ATTEMPTS TO WITHDRAW THE SUSPECTED FRAUD ACTIVITY DESIGNATION AGAINST HOROWITZ BUT BUNGLES THE PROCESS.**

~~52.~~53. In a letter dated November 3, 2021, Attorney Hal Block sent a letter to Bank of America, on behalf of Horowitz, disputing the Bank's reporting of suspected fraud activity to Chex. Ex 20.

~~53.~~54. On December 31, 2021, BOA employee Shaniqua Zachary sent an email to another employee, Nicka Tillie Campbell, asking the latter to do a "secondary review of business account <redacted>6566." Zachary stated, "Accounts were closed 4/2018 due to a cashier's check deposit." She also stated "Client is claiming that Union Bank is a (sic) fault which is why Union Bank paid debt of $70k to Bank of America"……"Client has obtained Legal consul (sic) and is requesting a resolution for RSC account closure. I believe client is seeking removal of negative reporting as well, per the account comments." Ex 21 [1]

~~54.~~55. In response to the December 31, 2021, email from Ms. Zachary, Leslie Herrington, a Senior Fraud Analyst, is brought into the email conversation. She reached out to Thompson asking him to review Zachary's email and advise if Horowitz can be removed from negative reporting. *Id*.

~~55.~~56. Thompson replied that he remembered "this case very well." He thought that the bank had an overpayment of $1996 in its possession. Moreover, he expressed that "since the bank has recovered the full amount, I have no objections with removing the customer from negative reporting." Id.

~~56.~~57. Thompson deposed:

[1] This may have been the beginning of BOA's bungled handling of this matter as the account into which the Check was deposited was NOT Account 6566, but was Horowitz's personal account, Account 2815.

a. If the Bank had not received the funds from Union Bank, he would not have agreed to remove Suspected Fraud Activity from Horowitz's Chex file. Ex 6 154:15-21.

b. He agreed to remove Horowitz from negative reporting from Chex because "everyone deserves a second chance." Ex 6 156:16-23.

c. His decision to remove Horowitz from negative reporting to Chex was not based on whether any alleged fraud took place. Ex 6 157:23 – 158:17.

d. If Horowitz had agreed to cover the loss to the Bank, he would not have been reported as Suspected Fraud Activity. Ex 6 178:20 – 179:4.

~~57.~~58. Herrington replied to Thompson's email stating that she would remove Horowitz from the Chex system. Ex 21.

~~58.~~59. Herrington sent her request to remove Mr. Horowitz from negative reporting to another bank employee, Audrey Battle. Ex 22 21:19-22.

**Audrey Battle Received and Declined Herrington's Request to Remove negative reporting about Horowitz from Chex Systems.**

~~59.~~60. Audrey Battle is in charge of placing and removing negative reporting on the Bank's customers to Chex. Ex 22 Ex 22 9:22 – 10:11.

~~60.~~61. Battle received Herrington's Request to remove the negative reporting from the Bank's tradeline for Horowitz, but declined it because Herrington's request recited the incorrect account number, Account 6566. Ex 22 21:19 – 22:10-12.

~~61.~~62. At the time Battle declined the request from Herrington, Battle knew that Horowitz was reported to Chex as suspected fraud activity for Account 2815. Ex 22 22:13-17.

~~62.~~63. Battle never followed up with Herrington to inquire as to why Herrington requested negative reporting about Horowitz be removed on an account not reported to Chex. Ex 22 22:18-21.

~~63.~~64. Battle is just too busy to follow up with analysts when they submit requests that she denies. Ex 22 25:15-22. But even if she had the time to do so, she would not have done so. Ex 22 26:2-4.

~~64.~~65. The Bank sends an automated email to analysts like Herrington, whose requests for removal from Chex are denied by Battle. Ex 22 26:13-16.

~~65.~~66. Battle testified that she did not make any mistake by declining Herrington's request to remove Horowitz from Chex. Ex 22 32:20-24.

~~66.~~67. Battle testified that she did not make any mistake by not following up with Herrington to find out why she asked to remove Horowitz from negative reporting on an account not reported by the Bank to Chex. Ex 22 33:1-6.

~~67.~~68. Battle knows the damage that can be caused to a consumer who is reported to Chex system. Ex 22 34:3-7.

**THE BANK ISSUES A LETTER TO HOROWITZ AGREEING TO REMOVE NEGATIVE REPORTING ABOUT HIM TO CHEX.**

~~68.~~69. In a letter dated January 5, 2022, Bank of America issued a letter to Horowitz agreeing to remove negative reporting about him to Chex, ("the Removal Letter") but the letter recited the incorrect account number, 6566 and not 2518. Ex 23 51:2-6, Ex 30.

~~69.~~70. Herrington admits that she made the mistake by reciting the wrong account number in the creation of the Removal Letter. Ex 23 51:2-11.

~~70.~~71. Herrington testified that the purpose of the Removal Letter was to advise Horowitz that BOA was going to remove the negative reporting about him to Chex Systems. Ex 23 51:23 – 52:3.

~~71.~~72. She testified that as of the date of the Removal Letter, that the negative reporting about Horowitz should have been removed. Ex 23a 45:21-25.

~~72.~~73. She admitted that she recited the incorrect account number in the Removal Letter Ex 23a 46:15-19.

~~73.~~74. On September 29, 2022, Horowitz relied upon the statements in the Removal Letter and attempted to open a bank account at NuVision Federal Credit Union. Ex 1 90:24-91:6, Ex 24.

~~74.~~75. He was embarrassed when he was turned down by NuVision due to the Bank of America item that continued to appear on his Chex file. Ex 1 97:24-98:6.

~~75.~~76. After the date of the Removal Letter of January 5, 2022, Horowitz's Chex report was viewed by Paypal Credit, the Business Backer, Headway Capital LLC and Bankers Healthcare Group. Ex 14.

~~76.~~77. Horowitz was unable to secure credit with any traditional bank because of the Bank of America item appearing on his Chex report. Ex 1 111:8-10.

**PLAINTIFF'S SECOND DISPUTE LETTER TO CHEX**

~~77.~~78. On September 30, 2022, Horowitz send a second Dispute Letter to Chex ("Second Dispute"). This time, he attached a copy of the Removal Letter that was sent to him by BOA. Ex 25.

~~78.~~79. The Request for Reinvestigation sent by Chex to BOA in the Second Dispute stated "*Consumer stated that he resolved this with your institution, and you reported that you are removing the information. This was not an accurate reporting. Please find enclosed copy of letter from your institution.*" Ex 25.

~~79.~~80. This second Request for Reinvestigation was responded to by Michael Pankowski on behalf of BOA. In his deposition, Pankowski testified:

a. He was not aware of any account other Account 2815 that was reported to Chex related to Horowitz. Ex 8 61:4-7.

b. He reviewed the Bank of America Removal Letter on the Bank's letterhead stating that the Bank had already submitted a request to ChexSystems to

remove the reporting from his credit file. Yet, he simply disregarded this letter because he could not "verify the validity" of it. Ex 8 55:16-23.

c. Because the Removal Letter recited the wrong account number, he simply disregarded it. Ex 8 59:10-24.

d. The Removal Letter gave him no pause that the Removal Letter, on Bank of America Letterhead, stated that it had removed negative reporting about Horowitz to Chex. Ex 8 60:15-23.

e. He saw Herrington's note which said "Fraud ops – Deposit Fraud Detection Delete. (Leslie Herrington 01/05/2022)." He did not understand what Herrington's note meant, so he simply disregarded that as well. Ex 8 67:21-68:24.

f. Pankowski never followed up with or called Herrington for clarification to understand her notation in the Bank's internal file. Ex 8 68:19-24.

g. He had no idea why BOA reported Plaintiff as having engaged in suspected fraud activity. Ex 8 58:7-20.

h. He simply took the Bank's internal notes from the RISC department and confirmed that the reporting of Plaintiff as having engaged in suspected fraud activity was accurate. Ex 8 70:21 – 72:1 and Ex 25.

~~80.~~81. Kevin Williams testified that if Pankowski had seen the Herrington-Thompson email thread, this would have been "new information" that should have caused Pankowski to remove the negative reporting from Chex. Ex 19 69:20-70:12.

~~81.~~82. In response to Plaintiff's Second Dispute Letter, Chex disregarded the Removal Letter as well because it referred to another account number. Ex 17 70:18 – 71:2.

~~82.~~83. Chex did not find the attached Removal Letter curious because it referred to another account. Ex 17 71:4-9.

~~83.~~84. It never occurred to Chex when investigating the Plaintiff's second dispute that the removal letter contained the wrong account number despite Ex 17 72:21 – 73:8.

~~84.~~85. On March 6, 2023, Plaintiff's counsel sent an email to Bank of America's attorney, Austin Kenney and attached the Removal Letter, asking Bank of America to remove the negative reporting from Chex as to Horowitz. Ex 26.

~~85.~~86. On March 7, 2023, BOA declined the request to cloak the negative reporting. *Id.*[2]

~~86.~~87. On March 28, 2023, the Bank finally agreed to delete the negative reporting "as a courtesy." Ex 27.

## PLAINTIFF IS NOW ABLE TO OPEN PERSONAL AND BUSINESS ACCOUNTS AT ORANGE COUNTY'S CREDIT UNION

[2] Mr. Kenney prefaced his response as "Confidential Settlement Communication" although no settlement was demanded or offered by either party. The purpose of Plaintiff's counsel's communication was merely to stem the tide of damages that had befallen Mr. Horowitz due to the bogus reporting of "Suspected Fraud Activity."

~~87.~~88. On May 3, 2023, Plaintiff returned to Orange County's Credit Union and was able to open an account now that the BOA item was removed from his Chex report. Ex 28.

### HOROWITZ SUFFERED DAMAGES DUE TO DEFENDANTS' FAILURE TO CONDUCT A REASONABLE REINVESTIGATION UNDER THE FCRA

~~88.~~89. Only due to Bank of America removing its item about the Plaintiff to Chex, has Horowitz been able to recently open bank accounts at Orange County's Credit Union. Id.

~~89.~~90. Horowitz was unable to secure loans at traditional banks in order to finance his business, leaving him vulnerable to merchant cash advance companies. Ex 1 110:4-16.

~~90.~~91. Because Bank of America and Chex failed to conduct any reinvestigation into his dispute:

a. Horowitz was unable to secure loans at traditional banks in order to finance his business, forcing him to pay $385,317 in additional interest to cash advance merchant companies in his business. Ex 1 105:12-17 and Ex 29.

b. Plaintiff could not get a Small Business Administration Loan because no bank would partner with SBA due the BOA item reporting on his Chex report. Ex 1 111:14-23.

c. Plaintiff had an SBA 7a interview with the Small Business Administration. Because of the Chex item, he had to stop pursuing his attempt at an SBA loan. Ex 1 115:8-116:10, 117:1-5.

d. Nu Vision Credit Union declined him as a customer after he obtained the Removal Letter from BOA because the Bank had continued to report negative information about him to Chex. Ex 1:90 3-10 and Ex 24.

e. Plaintiff was embarrassed and humiliated at Nu Vision having turned him down. He felt like a criminal. He was also surprised because according to the Removal Letter, BOA had removed the negative reporting about him months earlier. Ex 1 96:2-10.

f. He was prevented from opening several other businesses. He had purchased several internet domains and had business plans for these. However, because he could not get bank funding, he could not pursue these plans. Ex 1 141:8 – 142:3.

g. He has suffered great stress causing weight gain even after gastric bypass surgery. Ex 1 152:10- 153:5.

h. He has lost a great deal of sleep. He still wakes up around 2 or 3 a.m. and cannot go back to sleep. Ex 1 15 3:9-18. He has treated with Dr. Yuan for his sleep issues. Id. at 154:23-24.

DATED: 02/21/2024

By: */s/Stanley R. Apps*
Stanley R. Apps, Esq.
Attorneys for Plaintiff

**Certificate of Service**

I, Mark Javitch, hereby certify that on February 21, 2024, I served a copy of the foregoing document upon all parties and counsel as their addresses appear of record via this Court's CM/ECF system.

/s/ Mark Javitch