AUSTIN B. KENNEY (State Bar No. 242277)
abk@severson.com
MATTHEW J. ESPOSITO (State Bar No. 223445)
mje@severson.com
SEVERSON & WERSON
A Professional Corporation
The Atrium
19100 Von Karman Avenue, Suite 700
Irvine, California 92612
Telephone: (949) 442-7110
Facsimile: (949) 442-7118

Attorneys for Defendants CHEX SYSTEMS, INC. and BANK OF AMERICA, N.A.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

BRIAN HOROWITZ,

Plaintiff,

vs.

CHEX SYSTEMS, INC., a foreign corporation, and BANK OF AMERICA, N.A., a foreign corporation,

Defendants.

Case No. 8:22-cv-02002-DFM

*Assigned for all purposes to Hon. Douglas F. McCormick*

**DEFENDANTS' RESPONSE TO STATEMENT OF GENUINE DISPUTES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

*Filed concurrently with Memorandum of Points and Authorities; Declaration of Austin B. Kenney*

Date: March 19, 2024
Time: 10:00 a.m.
Crtrm.: 6B

Trial Date: May 7, 2024

Defendants Chex Systems, Inc, and Bank of America, N.A. submit this Statement of Genuine Disputes in opposition to Plaintiff's Motion for Partial Summary Judgment.

| **Plaintiff's Uncontroverted Facts and Supporting Evidence** | **Defendants' Responses to Cited Facts and Supporting Evidence** |
|---|---|
| 1. On April 14, 2023, Plaintiff filed his First Amended Complaint against the Defendants for negligent and willful violations of the Fair Credit Reporting Act. Dkt 31, Claims 1-4. This is the operative complaint in this action. | 1. Undisputed. |
| 2. In 2018, Plaintiff Brian Horowitz ("Plaintiff" or "Horowitz"), was the Chief Executive Officer of an entity called COD USA, INC. ("COD").<br><br>*Evidence*: Ex 1- 26:3-10.[1] | 2. Undisputed. |
| 3. Horowitz never owned any interest of COD USA, Inc.<br><br>*Evidence*: Ex 1 - 26:3-10. | 3. Undisputed. |
| 4. COD USA, Inc. was owned 100% by Heather Smulson.<br><br>*Evidence*: Ex 1 - 35:20-22. | 4. Undisputed. |
| 5. In 2018, COD USA Inc. had a business bank account at Union Bank (now it is part of U.S. Bank).<br><br>*Evidence*: Ex 3. | 5. Undisputed. |
| 6. On January 16, 2018, the following events took place: | 6. Undisputed. |

[1] All citations to "Exhibits" (abbreviated "Ex") in _both_ columns refer to Plaintiff's exhibits, unless otherwise noted.

| Plaintiff's Uncontroverted Facts and Supporting Evidence | Defendants' Responses to Cited Facts and Supporting Evidence |
|---|---|
| a. COD's account at Union Bank was served with an out of state garnishment order for $115,000.<br><br>*Evidence*: Ex 4 | a. Undisputed. |
| b. Union Bank's Legal Department froze COD's bank account.<br><br>*Evidence*: Ex 2 - 13:9-12 | b. Undisputed. |
| c. COD's office manager, Barbara Tolbert purchased a Cashier's Check ("the Check") with funds from COD's account at Union Bank.<br><br>*Evidence*: Ex 1 25:14-19. | c. Undisputed. |
| d. In order to purchase the Check, Union Bank's employee, Kyle Connors lifted the freeze on the Account and issued the $70,000 cashier's check payable to Horowitz.<br><br>*Evidence*: Ex 2 – 48:4-6. | d. Undisputed. |
| e. Horowitz deposited the Check into his personal account at Bank of America, with the last four digits of 2815 ("Account 2815").<br><br>*Evidence*: Ex 5. | e. Undisputed. |
| 7. Horowitz's Account 2815 was a personal bank account. *Evidence*: Ex 6 50:10. | 7. Undisputed. |
| 8. The face of the Check identifies the "remitter" as COD USA, Inc.<br><br>*Evidence*: Ex 7. | 8. Undisputed. |

| **Plaintiff's Uncontroverted Facts and Supporting Evidence** | **Defendants' Responses to Cited Facts and Supporting Evidence** |
|---|---|
| 9. At the time Horowitz deposited the Check into Account 2815, he also had another account at BOA ending in 6656 ("Account 6656"), which was a business account.<br><br>*Evidence*: Ex 8 28:12-23. | 9. Undisputed. |
| 10. Shortly after he deposited the Check into Account 2815, he made several distributions out of that account, believing the Check would be honored by Union Bank.<br><br>*Evidence*: Ex 9. | 10. Undisputed. |
| 11. On January 17, 2018, Union Bank's Kyle Connors learned that his employer's Legal Department had frozen the account and contacted Union Bank's Reconciliation Department for authorization to issue a stop payment order on the Check.<br><br>*Evidence*: Ex 2 13:9-12. | 11. Undisputed. |
| 12. On January 18, 2018, Horowitz noticed that his Account 2815 at BOA had not been credited for the $70,000 Check. This caused Horowitz to send an email to Mr. Connors. Connors replied to Horowitz stating that "*The funds leave the account as soon as the check is issued at the branch. There is still a processing time once it is deposited. I will speak with my service manager about it once she is back from her meeting this afternoon and get back to you with an update as soon as I have one.*<br><br>*Evidence*: Ex 10. | 12. Undisputed. |

| **Plaintiff's Uncontroverted Facts and Supporting Evidence** | **Defendants' Responses to Cited Facts and Supporting Evidence** |
|---|---|
| 13. Connors knew, at the time that he responded to Horowitz's email, that Union Bank had issued a stop payment on the Check, but purposefully failed to inform Horowitz that it had done so.<br><br>*Evidence*: Ex 2 52:21 – 53:18. | 13. Undisputed. |
| 14. Union Bank's FRCP 30(b)(6) witness, Julie Biszantz ("Biszantz") testified that Kyle Connors from Union Bank had requested the stop payment order on the Check when he learned that Union Bank's Legal Department had frozen the COD account.<br><br>*Evidence*: Ex 2 26:9-11. | 14. Undisputed. |
| 15. Biszantz also testified that Horowitz played no role in causing Union Bank to issue a stop payment order on the Check.<br><br>*Evidence*: Ex 2 64:2-14. | 15. Undisputed. |
| 16. Horowitz was not even notified by Union Bank of its intention to issue the stop payment order before it had done so.<br><br>*Evidence*: Ex 2 63:10-12. | 16. Undisputed. |
| 17. Resultantly, by February 5, 2018, Horowitz's personal account at Bank of America, Account 2815 was overdrawn by $69,316.08.<br><br>*Evidence*: Ex 9. | 17. Undisputed. |
| 18. Christopher Thompson ("Thompson") from BOA's Fraud Team, was assigned to conduct the initial investigation into Horowitz and the overdraft of Account 2815.<br><br>*Evidence*: Ex 6 72:7-15. | 18. Undisputed |

| **Plaintiff's Uncontroverted Facts and Supporting Evidence** | **Defendants' Responses to Cited Facts and Supporting Evidence** |
|---|---|
| 19. The Fraud Team at BOA receives referrals from the Overdraft Collections Department when the latter is unsuccessful at collecting accounts that are over drafted.<br><br>*Evidence*: Ex 6 63:7-12. | 19. Undisputed. |
| 20. Horowitz had explained to Thompson that Horowitz did not stop payment on the Check.<br><br>*Evidence*: Ex 12. | 20. Undisputed. |
| 21. Thompson testified that he was informed by Union Bank that the "remitter" stopped payment on the Check.<br><br>*Evidence*: Ex 6 43:9-10. | 21. Undisputed. However, Horowitz's memorandum grossly misstates this fact: "Thompson called Union Bank's customer service department and was 'referred to the "remitter" of the Check for details about who stopped payment on it.' SUF 21."<br><br>*Evidence*: Dkt. #46, pp. 4, 9. |
| 22. Thompson incorrectly believed that Horowitz was the remitter, even though the face of the Check shows that COD was the remitter.<br><br>*Evidence*: Ex 7 and Ex 6 62:5-13. | 22. Disputed. Mischaracterizes the cited testimony. Thompson testified that what, among other things, led him to suspect fraudulent activities was that the Check was "purchased by [a] business, owned by the—the purchaser or the remitter—and, according to Union Bank, the same remitter stopped payment on the check. Thompson did not say he believed that Horowitz was the remitter.<br><br>*Evidence*: Ex 6 6:5-13. |
| 23. Thompson did not know whether Horowitz or Union Bank issued the stop payment order.<br><br>*Evidence*: Ex 6 43:12 – 44:2. | 23. Undisputed. |

| Plaintiff's Uncontroverted Facts and Supporting Evidence | Defendants' Responses to Cited Facts and Supporting Evidence |
|---|---|
| 24. Thompson also incorrectly assumed that Horowitz owned COD USA, Inc.<br><br>*Evidence*: Ex 6 62:5-13. | 24. Disputed. Mischaracterizes the cited testimony. Thompson testified that the Check was "purchased by business, owned by the -- the purchaser or the remitter." He did not say that Horowitz was the purchaser or remitter or that he owned that business.<br><br>*Evidence*: Ex 6 62:5-7. |
| 25. The only information that Thompson ever had that Horowitz had engaged in suspected fraud activity was the information he received from Union Bank which "referred" him "to the remitter of the Check."<br><br>*Evidence*: Ex 6 81:22 – 82:11. | 25. Disputed. Mischaracterizes the cited testimony. Thompson testified that he recommended a fraud closure of Horowitz's account "[b]ased on the referral to our team and the circumstances involving the stop payment of the cashier's check," including the information from Union Bank that "the remitter placed the stock [sic: stop] payment."<br><br>*Evidence*: Ex 6 81:13-82:11. |
| 26. Horowitz never owned any interest in COD.<br><br>*Evidence*: Ex 1 25:8-13, 26:3-10. | 26. Undisputed. |
| 27. Nevertheless, Thompson chose to report Horowitz to Chex as having engaged in Suspected Fraud Activity because Union Bank had informed him that the "remitter" stopped payment on the Check, and because he believed that Horowitz owned COD USA, Inc.<br><br>*Evidence*: Ex 6 61:25- 62:13. | 27. Disputed. Mischaracterizes the cited testimony. Thompson did not testify that he believed Horowitz owned COD. See no. 24 above. Thompson did not report Horowitz as having engaged in suspected fraud activity. He recommended closure of Horowitz's account for suspected fraudulent activity. And the fact that Union Bank told him that the remitter stopped payment was only one of the pieces of information on which Thompson based that recommendation.<br><br>*Evidence*: Ex 6, 79:17-80:9, 81:1-12, 98:6-18, 118:7-119:1, 124:16-125:16, 174:2-175:4; Ex. 6, 61:25-62:13; Declaration of Austin B. Kenney Supporting Opposition (Kenney Opp. Decl., Ex. 3, (Thompson Depo.), 83:6-84:2, 113:12-115:4, 120:18-121:11.) |

| **Plaintiff's Uncontroverted Facts and Supporting Evidence** | **Defendants' Responses to Cited Facts and Supporting Evidence** |
|---|---|
| 28. Thompson knew that BOA was a Holder in Due Course as soon as the Check was deposited into Acct 2815 on January 16, 2018.<br><br>*Evidence*: Ex 6 67:9-10. | 28. Disputed. Mischaracterizes the cited testimony. Thompson testified that BANA became a holder in due course when the Check was deposited, not that he (Thompson) knew that fact at the time.<br><br>*Evidence*: Ex 6 67:9-10. |
| 29. Thompson asserted the Bank's rights as Holder in Due Course to Union Bank and demanded payment on the Check.<br><br>*Evidence*: Ex 12 and Ex 6 68:2-7. | 29. Undisputed. |
| 30. On May 22, 2018, BOA closed Horowitz's accounts including Account 2815 and Account 6566.<br><br>*Evidence*: Ex 6 46:1-6. | 30. Undisputed. |
| 31. Starting on May 25, 2018, BOA reported Horowitz to Chex as having engaged in "Suspected Fraud Activity" related to Account 2815.<br><br>*Evidence*: Ex 13 – Q and A 2. | 31. Disputed. Mischaracterizes the cited testimony. Starting on May 25, 2018, BANA reported to Chex that Horowitz's 2815 account was closed due to suspected fraudulent activity.<br><br>*Evidence*: Ex 13 Ans. to Int. #2(b). |
| 32. Union Bank ultimately made the Check good and paid the $70,000 to Bank of America on June 1, 2018.<br><br>*Evidence*: Ex 6 55:20-21 and Ex 14, p 2. | 32. Disputed. Mischaracterizes the cited testimony. Union Bank did not make the Check good. It separately paid BANA, reducing BANA's loss on the 2815 account to zero.<br><br>*Evidence*: Ex 6 55:20-21 and Ex 14, p 2. |
| 33. On July 28, 2021, Mr. Horowitz's account at Orange County Credit Union was closed due the reporting of Suspected Fraud Activity by BOA.<br><br>*Evidence*: Ex 15 | 33. Undisputed. |

| **Plaintiff's Uncontroverted Facts and Supporting Evidence** | **Defendants' Responses to Cited Facts and Supporting Evidence** |
|---|---|
| 34. On August 17, 2021, Horowitz disputed the reporting of Suspected Fraud Activity by BOA with Chex which caused Chex to create and send a Request for Reinvestigation to BOA.<br><br>*Evidence*: Ex 16. | 34. Undisputed. |
| 35. In his First Dispute to Chex, Horowitz informed Chex that he did not cause the stop payment order to be issued on the Check.<br><br>*Evidence*: Ex 16. | 35. Disputed. Mischaracterizes the cited testimony. Horowitz "state[d] that this issue was no fault of his own."<br><br>*Evidence*: Ex 16 p. 3. |
| 36. Chex Systems FRCP 30(b)(6) witness, Ms. Sarah Cables, is familiar with Chex policies and procedures related to reinvestigations.<br><br>*Evidence*: Ex 17 14:6-15.<br><br>She deposed as follows: | 36. Undisputed. |
| a. Chex reports are used by financial institutions that offer deposit accounts for consumers.<br><br>*Evidence*: Ex 17 17:15-20. | a. Undisputed. |
| b. BOA only reported Account 2815 to Chex and no other account related to Horowitz.<br><br>*Evidence*: Ex 17 22:9-16. | b. Undisputed. |
| c. A user of a Chex report who sees that a consumer is reported for "suspected fraud activity" is less likely to open an account for a consumer.<br><br>*Evidence*: Ex 17 26:8-13. | c. Disputed. Mischaracterizes the cited testimony. Cables testified that it was "definitely possible" that a user might be less likely to open an account under those circumstances.<br><br>*Evidence*: Ex 17 26:8-13. |

| Plaintiff's Uncontroverted Facts and Supporting Evidence | Defendants' Responses to Cited Facts and Supporting Evidence |
|---|---|
| d.   Having the flag of "suspected fraud activity" on a consumer's credit report is a very serious notation.<br><br>*Evidence*: Ex 17 28:5-9. | d.   Undisputed. |
| e.   Chex had no reason to doubt Mr. Horowitz's allegation that he had nothing to do with stopping payment on the Check.<br><br>*Evidence*: Ex 17 31:13-16. | e.   Undisputed. |
| f.   Chex admitted that an important, if not a critical factor to determining whether Horowitz should have been reported as having engaged in Suspected Fraud Activity is ascertaining who stopped payment on the Check.<br><br>*Evidence*: Ex 17 57:11 – 58:6. | f.   Disputed. Mischaracterizes the cited testimony. Cables testified that whether Union Bank unilaterally stopped payment on the Check was an important factor in resolving Horowitz's dispute.<br><br>*Evidence*: Ex 17 57:11 – 58:6. |
| g.   Chex also admitted that if, in fact, if Horowitz did not stop payment on the Check, he should NOT have been reported as having engaged in Suspected Fraud Activity.<br><br>*Evidence*: Ex 17 61:17 – 62:14. | g.   Disputed. Mischaracterizes the cited testimony. Cables testified that Horowitz's account should not have been reported if the Check was the basis for BANA's reporting the account and if the facts stated in Horowitz's first dispute were true; namely, that Union·Bank issued a stop payment on the Check through no fault of his own and that Union Bank made the check good as it was Union Bank's fault alone that the stop payment order was issued.·<br><br>*Evidence*: Ex 17 61:8 – 62:14. |
| h.   Chex did not investigate the question of who stopped payment on the Check.<br><br>*Evidence*: Ex 17 46:20 – 47:8. | h.   Disputed. Mischaracterizes the cited testimony. Cables testified that it was BANA's "responsibility to verify the accuracy and completeness of the information that they have submitted to ChexSystems.· And they did that in their response to our reinvestigation request."<br><br>*Evidence*: Ex 17 47:4-8. |

| Plaintiff's Uncontroverted Facts and Supporting Evidence | Defendants' Responses to Cited Facts and Supporting Evidence |
|---|---|
| i. Chex had no knowledge of who stopped payment on the Check.<br><br>*Evidence*: Ex 17 45:13-17. | i. Disputed. Mischaracterizes the cited testimony. Cables testified that she had no knowledge of whether Horowitz had any role in stopping payment of the Check as he claimed.<br><br>*Evidence*: Ex 17 45:7-17. |
| j. In response to the Chex Request for Reinvestigation, Bank of America confirmed its earlier reporting of Horowitz having engaged in Suspected Fraud Activity.<br><br>*Evidence*: Ex 16. | j. Disputed. BANA confirmed its earlier reporting that it had closed Horowitz's 2815 account for suspected fraudulent activity. Ex 16 is the Request for Reinvestigation as sent by Chex without BANA's response.<br><br>*Evidence*: See Dkt. #52-1, Page ID 1268 (BANA's response). |
| k. Chex merely relied upon what it was told by BOA in confirming the flag of "suspected fraud activity" about Horowitz.<br><br>*Evidence*: Ex 17 48:19-25. | k. Disputed. Mischaracterizes the cited testimony. Cables testified that Chex relies on BANA to furnish accurate information and when a consumer disputes the information, Chex double-checks with BANA to make sure it is accurate.<br><br>*Evidence*: Ex 17 48:19-25. |
| l. Chex put the responsibility of verifying the accuracy and completeness of what Chex reports solely onto the furnisher.<br><br>*Evidence*: Ex 17 46:20 – 47:8. | l. Disputed. Mischaracterizes the cited testimony. Cables testified that it was the furnisher's responsibility to verify the accuracy and completeness of the information that it submitted to Chex. She did not state that Chex put that responsibility on the furnisher or that it was solely the furnisher's responsibility.<br><br>*Evidence*: Ex 17 47:4-8. |

| **Plaintiff's Uncontroverted Facts and Supporting Evidence** | **Defendants' Responses to Cited Facts and Supporting Evidence** |
|---|---|
| m. Chex admitted that the extent of its reinvestigation into Horowitz's dispute that he engaged in suspected fraud activity, was to merely send a request for investigation and rely on the answer provided by Carly Adams.<br><br>*Evidence*: Ex 18 [sic: 17] 40:3-11. | m. Undisputed. |
| n. If a consumer disputes information, Chex merely double checks with Bank of America to make sure that it is accurate.<br><br>*Evidence*: Ex 18 [sic: 17] 48:22-25. | n. Undisputed. |
| 37. Horowitz's First Dispute to Chex was received and responded to by Carly Adams at Bank of America. *Evidence*: Ex 16 | 37. Undisputed. |
| 38. Adams has no idea what "suspected fraud activity" means in a Chex report.<br><br>*Evidence*: Ex 18 29:11-13. | 38. Disputed. Mischaracterizes the cited testimony. Adams testified that she did not know the details of what "suspected fraud activity" as shown on Chex's credit report meant.<br><br>*Evidence*: Ex 18 27:19-29:13. |
| 39. She did not know what fraud was committed that caused BOA to close Horowitz's account.<br><br>*Evidence*: Ex 18 30:22-23. | 39. Undisputed. |
| 40. She did not even know what behavior caused the Bank to report Horowitz for suspected fraud activity.<br><br>*Evidence*: Ex 18 32:8-10. | 40. Undisputed. |
| 41. She had no personal knowledge of Horowitz engaging in any fraud activity.<br><br>*Evidence*: Ex 18 48:12-16. | 41. Disputed. Mischaracterizes the cited testimony. Also, irrelevant.<br><br>*Evidence*: Ex 18 48:12-16. |

| **Plaintiff's Uncontroverted Facts and Supporting Evidence** | **Defendants' Responses to Cited Facts and Supporting Evidence** |
|---|---|
| 42. She did not know who stopped payment on the Check.<br><br>*Evidence*: Ex 18 25:5-7. | 42. Undisputed. |
| 43. Despite not knowing any of these things, she confirmed to Chex, in response to Plaintiff's First Dispute to Chex, that BOA was accurately reporting Horowitz for suspected fraud activity, all the same.<br><br>*Evidence*: Ex 18 33:2-4. | 43. Disputed. Mischaracterizes the cited testimony. Adams testified that she prepared the response to Chex's Request for Reinvestigation.<br><br>*Evidence*: Ex 18 33:2-4.<br><br>The response confirmed that the 2815 account had been closed for suspected fraudulent activity.<br><br>*Evidence*: See Dkt. #52-1, Page ID 1268 (BANA's response). |
| 44. The Bank's RISC Department provided the information that caused Adams to confirm that Horowitz had engaged in suspected fraud activity.<br><br>*Evidence*: Ex 18 41:15-21. | 44. Undisputed. |
| 45. Adams filled in the Request for Investigation form based solely on what she was told by the RISC Department.<br><br>*Evidence*: Ex 18 49:20 – 50:11. | 45. Undisputed. |
| 46. Adams candidly admitted that what the RISC Department had informed her of was not sufficient to tell her that the account should have been closed due to suspected fraud activity.<br><br>*Evidence*: Ex 18 50:13-18. | 46. Disputed. Mischaracterizes the cited testimony. Adams testified that one unidentified line of information was not enough but that she consulted other information as well.<br><br>*Evidence*: Ex 18 50:13-51:9. |
| 47. Kevin Williams, another FRCP 30(b)(6) witness for Bank of America, testified as to the reinvestigations performed by BOA. | 47. Undisputed. |

| Plaintiff's Uncontroverted Facts and Supporting Evidence | Defendants' Responses to Cited Facts and Supporting Evidence |
|---|---|
| 48. Williams testified that the RISC Department makes the finding of suspected fraud activity on Chex Reports.<br><br>*Evidence*: Ex 19 29:13-19. | 48. Disputed. Mischaracterizes the cited testimony. Williams testified that the RISC Department makes the determination of suspected fraudulent activity, not that it does so on Chex reports.<br><br>*Evidence*: Ex 19 29:13-19. |
| 49. Williams did not know if Horowitz had engaged in any fraud.<br><br>*Evidence*: Ex 19 41:22-23. | 49. Undisputed. |
| 50. The Bank's process for conducting reinvestigations in response to consumer disputes is only triggered if new information is provided in connection with the consumer's dispute.<br><br>*Evidence*: Ex 19 46:5-8. | 50. Disputed. Mischaracterizes the cited testimony. Williams did not testify about BANA's reinvestigation process in general but instead said that Horowitz's dispute supplied no new information that his team could take back to the fraud investigation team to see if the new information would change its original decision.<br><br>*Evidence*: Kenney Opp. Decl., Ex. 1, (Williams Depo.), 44:20-45:20. |
| 51. Because there was no new information provided by Horowitz, the Bank's policies and procedures are very clear for them (the investigators of Plaintiff's First and Second Disputes to Chex) "to hold the original decision."<br><br>*Evidence*: Ex 19 47:3-9. | 51. Disputed. Mischaracterizes the cited testimony. Williams testified that fraud investigation and maintaining accurate credit reporting are separate processes. Adams and Pankowski were involved with the credit reporting process and it was not up to them to investigate fraud. So, since there was no new information that they could send to the fraud investigation team to see if that information would change its decision they were not to hold to that team's original decision.<br><br>*Evidence*: Ex 19 46:9-47:13. |

| **Plaintiff's Uncontroverted Facts and Supporting Evidence** | **Defendants' Responses to Cited Facts and Supporting Evidence** |
| --- | --- |
| 52. Williams testified "the Bank's policy for reinvestigations (under the FCRA) is only to "investigate the reasonableness of the investigation."<br><br>*Evidence*: Ex 19 47:3-9 | 52. Disputed. Mischaracterizes the cited testimony. Williams said the last six quoted words in explaining the difference between the separate fraud investigation and accurate credit reporting processes. He did not testify about any general BANA policy for reinvestigations under FCRA.<br><br>*Evidence*: Ex 19 46:9-47:13. |
| 53. In a letter dated November 3, 2021, Attorney Hal Block sent a letter to Bank of America, on behalf of Horowitz, disputing the Bank's reporting of suspected fraud activity to Chex.<br><br>*Evidence*: Ex 20. | 53. Undisputed. |
| 54. On December 31, 2021, BOA employee Shaniqua Zachary sent an email to another employee, Nicka Tillie Campbell, asking the latter to do a "secondary review of business account <redacted>6566." Zachary stated, "Accounts were closed 4/2018 due to a cashier's check deposit." She also stated "Client is claiming that Union Bank is a (sic) fault which is why Union Bank paid debt of $70k to Bank of America"……"Client has obtained Legal consul (sic) and is requesting a resolution for RSC account closure. I believe client is seeking removal of negative reporting as well, per the account comments."<br><br>*Evidence*: Ex 21 | 54. Undisputed. |
| 55. In response to the December 31, 2021, email from Ms. Zachary, Leslie Herrington, a Senior Fraud Analyst, is brought into the email conversation. She reached out to Thompson asking him to review Zachary's email and advise if Horowitz can be removed from negative reporting. *Id.* | 55. Undisputed. |

| Plaintiff's Uncontroverted Facts and Supporting Evidence | Defendants' Responses to Cited Facts and Supporting Evidence |
|---|---|
| 56. Thompson replied that he remembered "this case very well." He thought that the bank had an overpayment of $1996 in its possession. Moreover, he expressed that "since the bank has recovered the full amount, I have no objections with removing the customer from negative reporting."<br><br>*Evidence*: *Id.* | 56. Undisputed. |
| 57. Thompson deposed: | 57. |
| a. If the Bank had not received the funds from Union Bank, he would not have agreed to remove Suspected Fraud Activity from Horowitz's Chex file.<br><br>*Evidence*: Ex 6 154:15-21. | a. Undisputed. |
| b. He agreed to remove Horowitz from negative reporting from Chex because "everyone deserves a second chance."<br><br>*Evidence*: Ex 6 156:16-23. | b. Undisputed. |
| c. His decision to remove Horowitz from negative reporting to Chex was not based on whether any alleged fraud took place.<br><br>*Evidence*: Ex 6 157:23 – 158:17. | c. Undisputed. |
| d. If Horowitz had agreed to cover the loss to the Bank, he would not have been reported as Suspected Fraud Activity.<br><br>*Evidence*: Ex 6 178:20 – 179:4. | d. Disputed. Mischaracterizes the cited testimony. Thompson testified that had Horowitz promptly paid the overdraft there was a chance his account would not have been referred to the fraud investigation team but that even if he had paid the account might have been referred because the overdraft was so large.<br><br>*Evidence*: Ex 6 178:14-179:23. |

| Plaintiff's Uncontroverted Facts and Supporting Evidence | Defendants' Responses to Cited Facts and Supporting Evidence |
|---|---|
| 58. Herrington replied to Thompson's email stating that she would remove Horowitz from the Chex system.<br><br>*Evidence*: Ex 21. | 58. Undisputed. |
| 59. Herrington sent her request to remove Mr. Horowitz from negative reporting to another bank employee, Audrey Battle.<br><br>*Evidence*: Ex 22 21:19-22. | 59. Undisputed. |
| 60. Audrey Battle is in charge of placing and removing negative reporting on the Bank's customers to Chex.<br><br>*Evidence*: Ex 22 Ex 22 9:22 – 10:11. | 60. Undisputed. |
| 61. Battle received Herrington's Request to remove the negative reporting from the Bank's tradeline for Horowitz, but declined it because Herrington's request recited the incorrect account number, Account 6566.<br><br>*Evidence*: Ex 22 21:19 – 22:10-12. | 61. Undisputed. |
| 62. At the time Battle declined the request from Herrington, Battle knew that Horowitz was reported to Chex as suspected fraud activity for Account 2815.<br><br>*Evidence*: Ex 22 22:13-17. | 62. Undisputed. |
| 63. Battle never followed up with Herrington to inquire as to why Herrington requested negative reporting about Horowitz be removed on an account not reported to Chex.<br><br>*Evidence*: Ex 22 22:18-21. | 63. Disputed. Battle explained that she did not personally follow up with Herrington because "[a] n automated email is sent to the analyst whenever we reject something. And it instructs them to look to see what, if any, other action is required."<br><br>*Evidence*: Ex 22 22:18-21, 26:7-16. |

| Plaintiff's Uncontroverted Facts and Supporting Evidence | Defendants' Responses to Cited Facts and Supporting Evidence |
|---|---|
| 64. Battle is just too busy to follow up with analysts when they submit requests that she denies.<br><br>*Evidence*: Ex 22 25:15-22.<br><br>But even if she had the time to do so, she would not have done so.<br><br>*Evidence*: Ex 22 26:2-4. | 64. Disputed. The stated fact is incomplete, omitting Battle's explanation of why she would not have followed up. See response to no. 63 above.<br><br>*Evidence*: Ex 22 22:18-21, 26:2-16. |
| 65. The Bank sends an automated email to analysts like Herrington, whose requests for removal from Chex are denied by Battle.<br><br>*Evidence*: Ex 22 26:13-16. | 65. Undisputed. |
| 66. Battle testified that she did not make any mistake by declining Herrington's request to remove Horowitz from Chex.<br><br>*Evidence*: Ex 22 32:20-24. | 66. Undisputed. |
| 67. Battle testified that she did not make any mistake by not following up with Herrington to find out why she asked to remove Horowitz from negative reporting on an account not reported by the Bank to Chex.<br><br>*Evidence*: Ex 22 33:1-6. | 67. Undisputed. |
| 68. Battle knows the damage that can be caused to a consumer who is reported to Chex system.<br><br>*Evidence*: Ex 22 34:3-7. | 68. Disputed. Mischaracterizes the cited testimony. Battle testified only that she was award that a bank could close an account of a person reported for suspected fraudulent activity.<br><br>*Evidence*: Ex 22 34:3-7. |

| **Plaintiff's Uncontroverted Facts and Supporting Evidence** | **Defendants' Responses to Cited Facts and Supporting Evidence** |
|---|---|
| 69. In a letter dated January 5, 2022, Bank of America issued a letter to Horowitz agreeing to remove negative reporting about him to Chex, ("the Removal Letter") but the letter recited the incorrect account number, 6566 and not 2518.<br><br>*Evidence*: Ex 23 51:2- 6, Ex 30. | 69. Undisputed. |
| 70. Herrington admits that she made the mistake by reciting the wrong account number in the creation of the Removal Letter.<br><br>*Evidence*: Ex 23 51:2-11. | 70. Undisputed. |
| 71. Herrington testified that the purpose of the Removal Letter was to advise Horowitz that BOA was going to remove the negative reporting about him to Chex Systems.<br><br>*Evidence*: Ex 23 51:23 – 52:3. | 71. Undisputed. |
| 72. She testified that as of the date of the Removal Letter, that the negative reporting about Horowitz should have been removed.<br><br>*Evidence*: Ex 23a 45:21-25. | 72. Undisputed. |
| 73. She admitted that she recited the incorrect account number in the Removal Letter.<br><br>*Evidence*: Ex 23a 46:15-19. | 73. Undisputed. |

| Plaintiff's Uncontroverted Facts and Supporting Evidence | Defendants' Responses to Cited Facts and Supporting Evidence |
| --- | --- |
| 74. On September 29, 2022, Horowitz relied upon the statements in the Removal Letter and attempted to open a bank account at NuVision Federal Credit Union.<br><br>*Evidence*: Ex 1 90:24-91:6, Ex 24. | 74. Disputed. Mischaracterizes the cited testimony. Horowitz did not testify that he relied on the Removal Letter in attempting to open an account at NuVision. He testified he went to open an account once he thought he "was fine with ChexSystems."<br><br>*Evidence*: Ex 1 90:24-91:6.<br><br>He attempted to open an account at NuVision nine months after receiving the Removal Letter.<br><br>*Evidence*: Ex 24, 30. |
| 75. He was embarrassed when he was turned down by NuVision due to the Bank of America item that continued to appear on his Chex file.<br><br>*Evidence*: Ex 1 97:24-98:6. | 75. Undisputed for purposes of this motion only. |
| 76. After the date of the Removal Letter of January 5, 2022, Horowitz's Chex report was viewed by Paypal Credit, the Business Backer, Headway Capital LLC and Bankers Healthcare Group.<br><br>*Evidence*: Ex 14. | 76. Disputed. Ex 14 is a credit report dated 08/05/2021. It does not show any inquiries made after January 5, 2022. |
| 77. Horowitz was unable to secure credit with any traditional bank because of the Bank of America item appearing on his Chex report.<br><br>*Evidence*: Ex 1 111:8-10. | 77. Disputed. Horowitz testified that he did not go back to a traditional bank because they use Chex. That Horowitz did not try does not prove that he would have been unable had he tried.<br><br>*Evidence*: Ex 1 111:8-10. |
| 78. On September 30, 2022, Horowitz send a second Dispute Letter to Chex ("Second Dispute"). This time, he attached a copy of the Removal Letter that was sent to him by BOA. Ex 25. | 78. Undisputed. |

| **Plaintiff's Uncontroverted Facts and Supporting Evidence** | **Defendants' Responses to Cited Facts and Supporting Evidence** |
|---|---|
| 79. The Request for Reinvestigation sent by Chex to BOA in the Second Dispute stated "Consumer stated that he resolved this with your institution, and you reported that you are removing the information. This was not an accurate reporting. Please find enclosed copy of letter from your institution."<br><br>*Evidence*: Ex 25. | 79. Undisputed. |
| 80. This second Request for Reinvestigation was responded to by Michael Pankowski on behalf of BOA. In his deposition, Pankowski testified: | 80. Undisputed. |
| a. He was not aware of any account other Account 2815 that was reported to Chex related to Horowitz.<br><br>*Evidence*: Ex 8 61:4-7. | a. Undisputed. |
| b. He reviewed the Bank of America Removal Letter on the Bank's letterhead stating that the Bank had already submitted a request to Chex-Systems to remove the reporting from his credit file. Yet, he simply disregarded this letter because he could not "verify the validity" of it.<br><br>*Evidence*: Ex 8 55:16-23. | b. Disputed. Mischaracterizes the cited testimony. Pankowski testified: "I did review this document. It was sent along with the Request for Reinvestigation from Chex. As far as verifying its validity, I can't -- I couldn't do that." He did not say he disregarded the letter because he could not verify its validity.<br><br>*Evidence*: Ex 8 55:20-23. |
| c. Because the Removal Letter recited the wrong account number, he simply disregarded it.<br><br>*Evidence*: Ex 8 59:10-24. | c. Disputed. Mischaracterizes the cited testimony. Pankowski testified that the letter referenced a different account and therefore was not related to the dispute he was working on.<br><br>*Evidence*: Ex 8 59:10-24. |

| **Plaintiff's Uncontroverted Facts and Supporting Evidence** | **Defendants' Responses to Cited Facts and Supporting Evidence** |
|---|---|
| d. The Removal Letter gave him no pause that the Removal Letter, on Bank of America Letterhead, stated that it had removed negative reporting about Horowitz to Chex.<br><br>*Evidence*: Ex 8 60:15-23. | d. Disputed. The fact is incomplete and misleading. Pankowski testified: "Once I saw that it was referring to a different account number than the one I was working, then at that point it did not give me pause. It was not pertaining to the account I was working at the time."<br><br>*Evidence*: Ex 8 60:19-23. |
| e. He saw Herrington's note which said "Fraud ops – Deposit Fraud Detection Delete. (Leslie Herrington 01/05/2022)." He did not understand what Herrington's note meant, so he simply disregarded that as well.<br><br>*Evidence*: Ex 8 67:21-68:24. | e. Disputed. Mischaracterizes the cited testimony. Pankowski testified that he saw the note and did not understand it, but he did not say he disregarded it.<br><br>*Evidence*: Ex 8 67:21-68:24. |
| f. Pankowski never followed up with or called Herrington for clarification to understand her notation in the Bank's internal file.<br><br>*Evidence*: Ex 8 68:19-24. | f. Undisputed. |
| g. He had no idea why BOA reported Plaintiff as having engaged in suspected fraud activity.<br><br>*Evidence*: Ex 8 58:7-20. | g. Disputed. The cited testimony does not state anything remotely resembling the stated fact. |
| h. He simply took the Bank's internal notes from the RISC department and confirmed that the reporting of Plaintiff as having engaged in suspected fraud activity was accurate.<br><br>*Evidence*: Ex 8 70:21 – 72:1 and Ex 25. | h. Disputed. Mischaracterizes the cited testimony. Pankowski testified that RISC department comment did not require him to respond to the Request for Reinvestigation as he did. He made the determination to do so after reviewing the account. The RISC department only confirmed that suspected fraudulent activity was the reason BANA closed the account.<br><br>*Evidence*: Ex 8 70:1-71:18. |

| **Plaintiff's Uncontroverted Facts and Supporting Evidence** | **Defendants' Responses to Cited Facts and Supporting Evidence** |
|---|---|
| 81. Kevin Williams testified that if Pankowski had seen the Herrington-Thompson email thread, this would have been "new information" that should have caused Pankowski to remove the negative reporting from Chex.<br><br>*Evidence*: Ex 19 69:20-70:12. | 81. Disputed. Mischaracterizes the cited testimony. Williams testified that Pankowski had not seen the email thread but not that if Pankowski had seen it that additional information would or should have caused him to remove the negative reporting.<br><br>*Evidence*: Ex 19 69:20-70:12. |
| 82. In response to Plaintiff's Second Dispute Letter, Chex disregarded the Removal Letter as well because it referred to another account number.<br><br>*Evidence*: Ex 17 70:18 – 71:2. | 82. Disputed. Mischaracterizes the cited testimony. Cables testified that if she had conducted the reinvestigation, she would not have found it curious that the letter referred to a different account and she would have done as the Chex agent actually did by providing the letter to BANA for it to reinvestigate.<br><br>*Evidence*: Ex 17 70:9-72:11. |
| 83. Chex did not find the attached Removal Letter curious because it referred to another account.<br><br>*Evidence*: Ex 17 71:4-9. | 83. Disputed. Mischaracterizes the cited testimony. Cables testified that if she had conducted the reinvestigation, she would not have found the Removal Letter curious. She did not testify as to what the Chex agent who actually handled the dispute thought.<br><br>*Evidence*: Ex 17 70:9-71:9. |
| 84. It never occurred to Chex when investigating the Plaintiff's second dispute that the removal letter contained the wrong account number despite<br><br>*Evidence*: Ex 17 72:21 – 73:8. | 84. Disputed. Incomplete fact. Mischaracterizes the cited testimony. Cables testified that to her knowledge, Chex did not suspect that BANA had made a mistake in the Removal Letter because it could be a completely different account that for whatever reason was not reported to Chex.<br><br>*Evidence*: Ex. 17 72:21 – 73:8. |

| Plaintiff's Uncontroverted Facts and Supporting Evidence | Defendants' Responses to Cited Facts and Supporting Evidence |
|---|---|
| 85. On March 6, 2023, Plaintiff's counsel sent an email to Bank of America's attorney, Austin Kenney and attached the Removal Letter, asking Bank of America to remove the negative reporting from Chex as to Horowitz.<br><br>*Evidence*: Ex 26. | 85. Undisputed but irrelevant. |
| 86. On March 7, 2023, BOA declined the request to cloak the negative reporting.<br><br>*Evidence*: *Id.* | 86. Undisputed but irrelevant. |
| 87. On March 28, 2023, the Bank finally agreed to delete the negative reporting "as a courtesy."<br><br>*Evidence*: Ex 27. | 87. Undisputed but irrelevant. |
| 88. On May 3, 2023, Plaintiff returned to Orange County's Credit Union and was able to open an account now that the BOA item was removed from his Chex report.<br><br>*Evidence*: Ex 28. | 88. Disputed. The cited exhibit shows only that Horowitz signed an application for an account for COD, not that the credit union opened the account or that it did so only because negative reporting was removed from the Horowitz's Chex report. |
| 89. Only due to Bank of America removing its item about the Plaintiff to Chex, has Horowitz been able to recently open bank accounts at Orange County's Credit Union.<br><br>*Evidence*: *Id.* | 89. Disputed. The cited exhibit shows only that Horowitz signed an application for an account for COD, not that the credit union opened the account or that it did so only because negative reporting was removed from the Horowitz's Chex report. |
| 90. Horowitz was unable to secure loans at traditional banks in order to finance his business, leaving him vulnerable to merchant cash advance companies.<br><br>*Evidence*: Ex 1 110:4- 16. | 90. Disputed. Horowitz testified that he did not go back to a traditional bank because they use Chex. That Horowitz did not try does not prove that he would have been unable had he tried.<br><br>*Evidence*: Ex 1 111:8-10. |

| **Plaintiff's Uncontroverted Facts and Supporting Evidence** | **Defendants' Responses to Cited Facts and Supporting Evidence** |
|---|---|
| 91. Because Bank of America and Chex failed to conduct any reinvestigation into his dispute: | 91. |
| a. Horowitz was unable to secure loans at traditional banks in order to finance his business, forcing him to pay $385,317 in additional interest to cash advance merchant companies in his business.<br><br>*Evidence*: Ex 1 105:12-17 and Ex 29. | a. Disputed. Irrelevant. Damages for business losses are not recoverable under the FCRA. *Dorian v. Community Loan Servicing, LLC*, No. 22-cv-04372, 2023 WL 395790, at *7-8 (N.D. Cal. Jan. 25, 2023); *Grigoryan v. Experian Information Solutions, Inc.*, 84 F. Supp. 3d 1044, 1081-82 (C.D. Cal. 2014). |
| b. Plaintiff could not get a Small Business Administration Loan because no bank would partner with SBA due the BOA item reporting on his Chex report.<br><br>*Evidence*: Ex 1 111:14-23. | b. Disputed. Irrelevant. Damages for business losses are not recoverable under the FCRA. *Dorian v. Community Loan Servicing, LLC*, No. 22-cv-04372, 2023 WL 395790, at *7-8 (N.D. Cal. Jan. 25, 2023); *Grigoryan v. Experian Information Solutions, Inc.*, 84 F. Supp. 3d 1044, 1081-82 (C.D. Cal. 2014). |
| c. Plaintiff had an SBA 7a interview with the Small Business Administration. Because of the Chex item, he had to stop pursuing his attempt at an SBA loan.<br><br>*Evidence*: Ex 1 115:8-116:10, 117:1-5. | c. Disputed. Irrelevant. Damages for business losses are not recoverable under the FCRA. *Dorian v. Community Loan Servicing, LLC*, No. 22-cv-04372, 2023 WL 395790, at *7-8 (N.D. Cal. Jan. 25, 2023); *Grigoryan v. Experian Information Solutions, Inc.*, 84 F. Supp. 3d 1044, 1081-82 (C.D. Cal. 2014). |
| d. Nu Vision Credit Union declined him as a customer after he obtained the Removal Letter from BOA because the Bank had continued to report negative information about him to Chex.<br><br>*Evidence*: Ex 1:90 3-10 and Ex 24. | d. Undisputed. |

| **Plaintiff's Uncontroverted Facts and Supporting Evidence** | **Defendants' Responses to Cited Facts and Supporting Evidence** |
|---|---|
| e. Plaintiff was embarrassed and humiliated at Nu Vision having turned him down. He felt like a criminal. He was also surprised because according to the Removal Letter, BOA had removed the negative reporting about him months earlier. *Evidence*: Ex 1 96:2-10. | e. Undisputed for purposes of this motion only. |
| f. He was prevented from opening several other businesses. He had purchased several internet domains and had business plans for these. However, because he could not get bank funding, he could not pursue these plans. *Evidence*: Ex 1 141:8 – 142:3. | f. Disputed. Irrelevant. Damages for business losses are not recoverable under the FCRA. *Dorian v. Community Loan Servicing, LLC*, No. 22-cv-04372, 2023 WL 395790, at *7-8 (N.D. Cal. Jan. 25, 2023); *Grigoryan v. Experian Information Solutions, Inc.*, 84 F. Supp. 3d 1044, 1081-82 (C.D. Cal. 2014). |
| g. He has suffered great stress causing weight gain even after gastric bypass surgery. *Evidence*: Ex 1 152:10- 153:5. | g. Undisputed for purposes of this motion only. |
| h. He has lost a great deal of sleep. He still wakes up around 2 or 3 a.m. and cannot go back to sleep. Ex 1 15 3:9-18. He has treated with Dr. Yuan for his sleep issues. *Evidence*: *Id.* at 154:23-24. | h. Undisputed for purposes of this motion only. |
| **Defendants' Statement Of Additional Uncontroverted Facts and Supporting Evidence** | |

| Plaintiff's Uncontroverted Facts and Supporting Evidence | Defendants' Responses to Cited Facts and Supporting Evidence |
|---|---|
| | 92. In January 2018, Horowitz learned that one of COD's creditors, Marigold Funding, LLC, with which COD had entered into a merchant cash advance agreement, had secured a judgment by confession against COD in New York state court and was threatening to garnish COD's Union Bank account(s) to satisfy that judgment.<br><br>*Evidence*: Dkt # 52-3, 27:12-29:8; Dkt #52-1, Ex 3, Supp. Ans to Interrog. #19; Kenney Opp. Decl., Ex. 4 (Horowitz Depo.), Ex. 5. |
| | 93. To avoid the garnishment, Horowitz directed COD's office manager, Barbara Tolbert, to empty COD's account by purchasing from Union Bank a $70,000 cashier's check payable to Horowitz.<br><br>*Evidence*: Dkt #52-1, Ex 3, Supp. Ans to Interrog. #19.; Dkt #52-3, Ex 9, 25:3-19, 26:17-25, 35:14-19 & Ex. 4. |
| | 94. In the two days after depositing the Check in his 2815 account at BANA, Horowitz made 19 transfers from that account, reducing the account balance to less than $700.<br><br>*Evidence*: Dkt #52-3, Ex 9, 36:10-37:24 & Ex. 7. |
| | 95. One of those transfers, in the amount of $25,000, was to Prologis, COD's landlord.<br><br>*Evidence*: Dkt #52-3, Ex 9, 37:16-22 & Ex. 7. |

| Plaintiff's Uncontroverted Facts and Supporting Evidence | Defendants' Responses to Cited Facts and Supporting Evidence |
| --- | --- |
| | 96. After the Check was returned unpaid, BANA contacted Horowitz, attempting to collect the $69,315.08 overdraft in Horowitz's 2815 account.<br><br>*Evidence*: Dkt #52-2, Ex 6, 63:14-65:1, 69:15-23 & Ex. 5. |
| | 97. Only after several months passed without Horowitz arranging to pay the overdraft in his account did BANA's Overdraft Collections Department refer the account to BANA's Global Financial Crimes Compliance unit for investigation.<br><br>*Evidence*: Dkt #52-2, Ex 9, 58:21-60:22, 63:3-12, 174:2-175:4 & Ex. 8. |
| | 98. A member of that unit, Thompson investigated the account. He called both Horowitz and Union Bank. Union Bank told Thompson the remitter had stopped payment on the Check. Horowitz denied that he had stopped payment on the check.<br><br>*Evidence*: Dkt #52-2, Ex 6. 11:25-12:14, 35:23-36:3, 111:11-112:11, 120:2-16, 125:18-126:2, 174:13-175:4. |
| | 99. Thompson asked Horowitz to send additional information supporting his denial. Horowitz sent an email in return pleading his innocence but not providing the requested documentation.<br><br>*Evidence*: Kenney Opp. Decl., Ex. 3, 82:15-84:2 & Ex 10, 11. |
| | 100. Horowitz testified that when he talked to Thompson, he told Thompson everything that went on and sent him every document that Horowitz had."<br><br>*Evidence*: Kenney Opp. Decl., Ex. 4, 75:20-76:21. |

DATED: February 27, 2024

SEVERSON & WERSON
A Professional Corporation

By: *\/s/ Matthew J. Esposito*
MATTHEW J. ESPOSITO

Attorneys for Defendants CHEX SYSTEMS, INC. and BANK OF AMERICA, N.A.

70014.0757/16723444.2

- 29 -

DEFENDANTS' RESPONSE TO STATEMENT OF GENUINE DISPUTES OPPOSING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT