# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| BRIAN HOROWITZ, | No. SA CV 22-02002-DFM |
| Plaintiff(s), | Order Regarding Motions for Summary Judgment (Dkts. 46, 47, 50) |
| v. | |
| CHEX SYSTEMS, INC. et al., | |
| Defendant(s). | |

Plaintiff Brian Horowitz filed this lawsuit against Defendants Chex Systems, Inc. ("Chex") and Bank of America, N.A. ("BANA"), alleging violations of the Fair Credit Report Act ("FCRA"), 15 U.S.C. § 1681 et. seq., as well as state-law claims.

The parties have cross-moved for summary judgment.[1] The Court held a hearing on March 19, 2024. For the reasons set forth below, the motions are granted in part and denied in part.

---

[1] See Dkts. 46 ("Horowitz MSJ"), 47-1 ("Chex MSJ"), 50 ("BANA MSJ"), 60 ("Horowitz BANA Opp'n"), 61 ("Horowitz Chex Opp'n"), 62 ("BANA/Chex Opp'n"), 65 ("Horowitz Reply"), 66 ("BANA Reply"), 68 ("Chex Reply").

## I.   BACKGROUND

The following facts are undisputed for purposes of summary judgment and taken from the parties' statements of genuine disputes of material fact.[2] The Court will address the parties' contentions that certain facts are disputed where they pertain to material facts the Court relies upon in reaching its decision.

### A.   Payment Is Stopped on a $70,000 Check

In 2018, Horowitz was the CEO of COD USA, Inc. ("COD"). See Chex UF ¶ 1. COD maintained its bank accounts at Union Bank. See id. ¶ 2.

On January 16, 2018, COD's account at Union Bank was served with a garnishment order for $115,000 as the result of a judgment obtained against COD in a New York state court. See Horowitz UF ¶ 6a; Chex UF ¶ 3. Union Bank froze COD's account. See Horowitz UF ¶ 6b. At Horowitz's direction, COD's office manager purchased from Union Bank a $70,000 cashier's check payable to Horowitz. See id. ¶ 6c. A Union Bank employee lifted the freeze on COD's account to issue the cashier's check. See id. ¶ 6d. COD was the check's remitter. See id. ¶ 8.[3]

That same day, Horowitz deposited the $70,000 cashier's check into his personal BANA account, ending in -2815 (the "2815 Account"). See id. ¶ 6e. Over the next two days, Horowitz made 19 transfers from the 2815 Account, reducing the account balance to less than $700. See Chex UF ¶ 8.

---

[2] See Dkts. 48 ("Chex UF"), 51 ("BANA UF"), 54 ("Horowitz UF"). The Court also considered the various statements in opposition and reply. See Dkts. 63 ("BANA/Chex UF Opp'n"), 65-2 ("Horowitz UF Reply") 67 ("BANA UF Reply"), 69 ("Chex UF Reply").

[3] A remitter is "a person who purchases an instrument from its issuer if the instrument is payable to an identified person other than the purchaser." U.C.C. § 3-103.

On January 18, 2018, Union Bank returned the check to BANA unpaid and marked "08-PAYMENT STOPPED." See id. ¶ 9. As a result, BANA charged the item back to Horowitz's 2815 Account, leaving the account overdrawn by $69,315.08. See id. ¶ 10.

**B.    BANA Closes Horowitz's Accounts**

After BANA was unable to collect the overdrawn balance, BANA's collections department referred the 2815 Account to a financial crimes group for review. See Chex UF ¶¶ 11, 12. After speaking with Union Bank's customer service department and Horowitz, BANA fraud investigator Christopher Thompson credited Union Bank's statement that the remitter had stopped payment on the check. See id. ¶¶ 13-15.

Accordingly, on April 12, 2018, Thompson recommend that Horowitz's personal and business accounts be closed. See id. ¶ 16. Additionally, Thompson recommended that Horowitz be referred for reporting by Chex, a credit reporting agency, for suspected fraud activity. See id. On May 22, 2018, BANA closed the 2815 Account as well as Horowitz's two business accounts. See id. ¶ 19. BANA booked the 2815 Account's negative balance of $68,515.67 as a bank loss. See id. Additionally, based on Thompson's recommendation, BANA informed Chex that the 2815 Account was closed for suspected fraud activity with an original charge off amount of $68,003.75 and a closure status of paid in full. See id. ¶ 20. Chex thereafter reported that the 2815 Account was closed for suspected fraud activity. See id. ¶ 21.

In June 2018, in response to BANA's demands on the cashier's check, Union Bank sent BANA a $70,000 check. See id. ¶ 22. BANA's receipt of the check left a small balance that was eventually paid to Horowitz. See id.

**C.    Horowitz's First Dispute**

In July 2021, Horowitz opened a business account for an LLC at Orange County's Credit Union. See Chex UF ¶ 23. On or around July 28, 2021, the

credit union closed the account based on information provided by Chex about Horowitz's history of suspected fraud activity and account abuse. See id. ¶ 24.

Horowitz then obtained a copy of his credit report from Chex, which reflected BANA's report that his 2815 Account had been closed due to suspected fraud activity with an original charge off amount of nearly $70,000. See id. ¶ 25. In August 2021, Horowitz fired off a dispute letter to Chex, which sent BANA a request for reinvestigation. See id. ¶ 26. BANA responded to Chex by reporting that the account was closed for breaching the account agreement and that suspected fraud activity was placed by the RISC department. See id. ¶¶ 27-29. Relying on that information, Chex did not further investigate Horowitz's dispute. See id. ¶¶ 30-32.

### D.    BANA's Request to Delete Chex Reporting

Through counsel, Horowitz continued to dispute BANA's negative reporting to Chex. See Horowitz UF ¶ 53. These efforts ultimately led to a review of the reporting by Leslie Herrington, a senior fraud analyst on BANA's high risk mitigation team. See id. ¶ 55; Chex UF ¶ 33. On January 5, 2022, Herrington submitted an internal request to delete Horowitz's negative reporting to Chex. See Chex UF ¶ 33. However, Herrington incorrectly referenced Horowitz's business account ending in 6566, rather than the 2815 Account. See id. ¶ 34. The same day, BANA sent a letter to Horowitz (the "January 5 Letter") reporting that it had submitted a request to Chex to remove the negative reporting from his credit file. See id. ¶ 35. The January 5 Letter also erroneously referred to the account ending in 6566. See id. ¶ 37.

Herrington's internal request was sent to Audry Battle, BANA's Hotfile FCRA analyst. See id. ¶ 40. Battle declined the request since it referenced the account ending in 6566. See id. ¶ 41. Ultimately, Chex did not receive a request from BANA to remove negative reporting on any of Horowitz's accounts. See id. ¶ 52.

**E.     Horowitz's Second Dispute**

In September 2022, NuVision Credit Union would not allow Horowitz to open up new personal and business accounts because he still had negative information on his Chex credit report. See Chex UF ¶ 44. Horowitz submitted a second dispute letter to Chex and attached the January 5 Letter. See id. ¶ 45.

Chex sent BANA another request for reinvestigation. See id. ¶ 46. BANA's response checked boxes indicating that the disputed information was complete and accurate, that its reason for closing the account met Chex's standard for "suspected fraud," and stated that the reporting of suspected fraud activity "is accurate and shall remain." Id. ¶ 47. Per that information, Chex did not further investigate Horowitz's dispute. See id. ¶ 54.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those necessary to the proof or defense of a claim and are determined by reference to substantive law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." Celotex v. Catrett, 477 U.S. 317, 323-24 (1986).

The moving party "bears the initial responsibility of informing the district court" that "there is an absence of evidence to support the nonmoving party's case." Id. at 323, 325. The non-moving party must then "present some evidence establishing each element of their claims on which they would bear the burden of proof at trial." Smolen v. Deloitte, Haskins & Sells, 921 F.2d 959, 963 (9th Cir. 1990). Conclusory allegations unsupported by factual data are insufficient to defeat a summary judgment motion. See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

The court views the evidence through the prism of the evidentiary standard of proof that would apply at trial. See Anderson, 477 U.S. at 255. The court draws all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight that particular evidence is accorded. See Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1991). The court determines whether the non-moving party's "specific facts," coupled with disputed background or contextual facts, are such that a reasonable jury might return a verdict for the non-moving party. T.W. Elec. Serv. v. Pac. Elec. Contractors, 809 F.2d 626, 631 (9th Cir. 1987). In such a case, summary judgment is inappropriate. See Anderson, 477 U.S. at 248. However, where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III.   DISCUSSION

Both sides move for summary judgment on Horowitz's claims for negligent and willful violation of the FCRA. BANA additionally moves for summary judgment on Horowitz's claims for promissory estoppel and fraud.

## A.   Violation of the FCRA

Congress enacted the FCRA to "ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 52 (2007). The FCRA imposes a set of duties so that credit reporting agencies (CRAs) "exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1153 (9th Cir. 2009) (quoting 15 U.S.C. § 1681(a)(4)). Relevant here are the duties of CRAs and furnishers of information to provide accurate information and conduct a reasonable investigation. See 15 U.S.C. §§ 1681e(b), 1681i, 1681s-2.

### 1.    Actual Inaccuracy

"Although the FCRA . . . does not on its face require that an actual inaccuracy exist for a plaintiff to state a claim, many courts, including our own, have imposed such a requirement." <u>Carvalho v. Equifax Info. Servs. LLC</u>, 629 F.3d 876, 890 (9th Cir. 2010). An item on a credit report is "inaccurate" if it is "patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." <u>Id.</u> (quoting <u>Gorman</u>, 584 F.3d at 1163). "[A]t the very least, information that is inaccurate 'on its face,' is 'patently incorrect.'" <u>Drew v. Equifax Info. Servs., LLC</u>, 690 F.3d 1100, 1108 (9th Cir. 2012) (citation omitted).

BANA and Chex argue that the information furnished and reported—that Horowitz's 2815 Account was closed for suspected fraud activity—was accurate. <u>See</u> BANA MSJ at 13-16.[4] BANA notes that Thompson recommended closure of the 2815 Account because he suspected fraudulent activity, believing that Horowitz transferred the proceeds of the cashier's check before BANA learned that payment on the check was stopped. <u>See id.</u> at 14. Horowitz responds that BANA did not have a legitimate basis to suspect fraud because it was Union Bank that stopped payment on the check. <u>See</u> Horowitz BANA Opp'n at 13-14.

During Thompson's investigation, Union Bank told Thompson that the remitter (here, COD) had stopped payment on the check. <u>See</u> Dkt. 49, Declaration of Austin B. Kenney ("Kenney Decl."), ¶ 7, Ex. 6, Deposition of Christopher Thompson ("Thompson Depo.") at 111:11-119:25. As it appeared that COD both placed the stop payment and was the recipient of the funds, "it

---

[4] The Court cites primarily to BANA's motion, where appropriate. Additionally, all citations are to the CM/ECF pagination.

was considered potential fraud." Id. at 118:22-119:1. But it is now undisputed that Union Bank stopped payment on the check. See Horowitz UF ¶¶ 14-16.[5] When asked during deposition if it would be considered potential fraud regardless of who placed the stop payment, Thompson answered that it "really depends on the circumstances as to why Union Bank would have placed that stop payment and not the remitter to make that determination as to potential fraud." Thompson Depo. at 119:3-21. Thompson continued, "all we know is that Union Bank informed me that the remitter placed the stop payment, so that's what we based our determination on." Id. at 119:22-25 (cleaned up).

Defendants argue that who stopped payment is a red herring, as suspected fraud activity was, in fact, the reason BANA closed the 2815 Account.[6] But the summary judgment standard is a steep one, proper only when no reasonable jury could return a verdict for the non-moving party. In addition to Thompson's equivocal testimony about whether a finding of suspected fraud would have followed if Union Bank stopped payment, Horowitz also notes that BANA ultimately agreed to remove the negative reporting. While BANA casts that decision as gratuitous, the Court must take all inferences in Horowitz's favor. Here, the Court cannot exclude the possibility that a reasonable jury could conclude that reporting Horowitz for suspected fraud activity was untrue or facially inaccurate. See Drew, 690 F.3d at 1108 (reversing summary judgment on an FRCA claim, finding that a jury

---

[5] BANA speculated in its papers that other COD employees may have stopped payment on the check. See BANA MSJ at 15. At the hearing, BANA and Chex both agreed it was undisputed that Union Bank stopped payment.

[6] At the hearing, BANA attempted to distinguish the reason Horowitz's account was closed and the facts underlying the decision, arguing that the latter is irrelevant under the FCRA. Even assuming that is a viable distinction, the Court would still find that Horowitz has raised a genuine factual dispute as to whether his credit report included an inaccuracy.

"may well find that reporting the fraudulently opened account as a lost or stolen account belonging to [the plaintiff] was untrue or facially inaccurate").

## 2.   BANA's Investigation—§ 1681s

Section 1681s-2(b) imposes four duties on furnishers once they have received notice of a dispute from a CRA: (1) conduct an investigation, (2) review all relevant information received from CRA, (3) report any inaccuracies found, and (4) modify, delete, or block any incorrect information. See 15 U.S.C. § 1681s-2(b)(1). Here, BANA's duties were triggered by Chex's two reinvestigation requests.

The central question is "whether the furnisher's procedures were reasonable in light of what it learned about the nature of the dispute from the description in the CRA's notice of dispute." Gorman, 584 F.3d at 1157. Summary judgment "is generally an inappropriate way to decide questions of reasonableness" and "is appropriate when only one conclusion about the conduct's reasonableness is possible." Id.

### a.   First Dispute

In August 2021, Chex sent BANA a request for reinvestigation after Horowitz disputed the reporting for suspected fraud activity. See Dkt. 47-2, Declaration of Sarah Cables ("Cables Decl.") ¶ 11, Ex. 9.[7] Under "reason for reinvestigation," Chex included Horowitz's statement that the stop payment "was no fault of his own and should not be listed as fraud." Id. Chex requested BANA confirm that the reason it suspected fraud activity met Chex's standard. See id.

BANA's response stated: "Due to deposit activity this account was placed under review. During the review it was determined that the account

---

[7] The alphabetical exhibit labels in Cables' Declaration do not correspond with the numerical exhibit labels on the exhibits themselves. The Court uses the numerical labels.

breached the account agreement. Because of this breach the account was closed. No further investigation can be provided at this time." Id. ¶ 12, Ex. 9. Under "Accuracy of Information," BANA wrote, "'Suspected Fraud Activity' was placed by RISC Dept. Please contact RISC at (1-877-240-6886, opt 2)." Id. Under "Reinvestigation Results, BANA confirmed that the "reporting of suspected fraud activity is accurate and shall remain." Id.

Carly Adams conducted BANA's investigation and prepared its response to Chex's reinvestigation request. See Dkt. 52, Kenney Decl. ¶ 4, Ex. 3, Deposition of Carly Adams ("Adams Depo.") at 33:2-4. In preparing the response, Adams relied primarily on BANA's Flash computer system. See id. at 36:12-37:4. The Flash notes Adams viewed reflected that BANA's RISC department closed the 2815 Account for suspected fraud. See id. at 43:8-9; 45:21-47:6. Adams testified that the dispute response was accurate because it matched BANA's system of record findings. See id. at 50:3-11.

Horowitz alleges that BANA failed in its duties because it relied solely on its initial investigation and that BANA's policy of only investigating if a consumer provides new information is contrary to the FCRA. See Horowitz MSJ at 15-17. BANA argues that its investigation was reasonable, asserting that there was no reason to look further because there was no reason to doubt the accuracy of the Flash system notes. See BANA MSJ at 16-18.

Triable issues of fact remain with respect to the reasonableness of BANA's first investigation. A reasonable jury could conclude that BANA's investigation was sufficient in light of Chex's notice of dispute. A reasonable jury could also conclude the opposite, that Adams (and BANA more generally) should have done more than rubberstamp Thompson's initial recommendation. On the record before it, the Court concludes that summary judgment is not appropriate. See Guimond v. Trans Union Credit Info Co., 45 F.3d 1329, 1333 (9th Cir. 1995) ("The reasonableness of the procedures and

whether the agency followed them will be jury questions in the overwhelming
majority of cases.").

>       b.      Second Dispute

In September 2022, Horowitz submitted another dispute letter to Chex,
stating that he had resolved the matter with BANA and attaching the January
5 Letter. See Cables Decl., ¶ 13, Ex. 13. Chex sent BANA another request for
reinvestigation. See id. Under "Reason for Reinvestigation," Chex included
Horowitz's statement that he "resolved this with your institution, and you
reported that you are removing the information." Id. BANA's response stated:
"The reporting of suspected fraud activity is accurate and shall remain." Id.,
Ex. 14.

Michael Pankowski conducted this second investigation and prepared
BANA's response to Chex's reinvestigation request. See Kenney Decl., ¶ 5,
Ex. 4, Deposition of Michael Pankowski ("Pankowski Depo.") at 54:1-9.
Pankowski testified that he disregarded the January 5 Letter because it
referenced a different account number. See id. at 53:15-25, 55:10-23.
Pankowski also disregarded Herrington's internal note ("Fraud Ops –Deposit
Fraud Detection Delete (Herrington Leslie 01/05/2022.") because he did not
know what it meant. See id. at 68:3-24. The Flash notes Pankowski viewed
reflected that BANA's RISC department closed the 2815 Account for
suspected fraud. See id. at 70:7-71:18. Pankowski agreed that the RISC's
department's comment of "QDA GFCC" was determinative in his
investigation before responding to the dispute. See id. at 70:21-71:2 ("I took
that information from the [RISC] team as the reason why this account was
closed for suspected fraud activity.").[8]

---

[8] QDA is "Quote the Deposit Agreement" and GFCC is BANA's Global
Financial Crimes team. See id. at 47:4-6.

11

Horowitz alleges that BANA's conduct was unreasonable. See Horowitz MSJ at 17-18. Horowitz contends that Pankowski should have investigated why BANA sent Horowitz a letter stating that it had removed negative reporting about an account that was never reported to Chex. See id. at 18. Additionally, Horowitz argues that BANA disregarded its own internal records showing that the negative reporting was supposed to have been deleted. See id. BANA responds that it was not unreasonable for Pankowski to disregard the January 5 letter and not question Herrington's "cryptic note." See BANA/Chex Opp'n at 15. Moreover, argues BANA, the decision to delete the negative reporting was "purely gratuitous," not an indication that the initial decision to close the 2815 Account for suspected fraudulent activity was wrong. See id. at 15-16.

Again, triable issues of fact remain with respect to the reasonableness of BANA's second investigation. A reasonable jury could conclude that Pankowski's investigation was sufficient under the statute, and that his decision to disregard the January 5 Letter and Herrington's note was not unreasonable. On the other hand, a reasonable jury could also conclude that Pankowski should have investigated further, especially considering the documentary evidence in Horowitz's favor.

### 3. Chex's Reasonable Procedures—§ 1681e(b)

Section § 1681e(b) requires a CRA, when preparing a consumer credit report, to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). Because the FCRA "does not impose strict liability," a CRA can escape § 1681e(b) liability if it establishes that an inaccurate report was generated even though it followed reasonable procedures. See Guimond, 45 F.3d at 1333. "The reasonableness of the procedures and whether the

agency followed them will be jury questions in the overwhelming majority of cases." Id.

Chex maintains that it acted reasonably by relying on BANA's response, which is "a reliable source of credit information." Chex MSJ at 15-18. Chex states that it had no reason at any point to doubt the accuracy of the information BANA furnished and thus no reason to conduct its own investigation. See id. Horowitz responds that he provided Chex with information to doubt BANA's findings, such as identifying Union Bank as who stopped payment on the check, and thus reasonableness is a disputed question of fact. See Horowitz Chex Opp'n at 10-12.[9]

In Saenz v. Trans Union, LLC, the district court granted the CRA's motion for summary judgment on plaintiff's § 1681e(b) claim. See 621 F. Supp. 2d 1074 (D. Or. 2007). The court noted that the CRA was entitled to rely on facially credible information it received from plaintiff's creditors, and that the reasonableness of the CRA's reinvestigation following plaintiff's two disputes was not material to the reasonable procedure inquiry. See id. at 1080-81 ("[T]he Federal Trade Commission commentary on Section 1681e(b) suggests that an agency's Section 1681e(b) obligations relate to the maintenance and operation of its own internal databases rather than to investigation of the accuracy of information received from external sources.").

Similarly, in Grigoryan, the district court granted summary judgment for the CRAs where the plaintiff adduced no evidence that the CRAs had reason to believe that the furnishers, including BANA, "were not reputable sources of information." See 84 F. Supp. 3d 1044, 1067-72 (C.D. Cal. 2014). The court noted that all of plaintiff's proof related exclusively to the CRAs

---

[9] Although Horowitz's FAC alleges that Chex violated § 1681e(b), Horowitz did not move for summary judgment on that claim.

reinvestigation procedures, which was "not probative of the fact that defendants have violated § 1681e(b)." Id. at 1071 (citing various cases that highlighted the differences between § 1681e(b) and § 1681i).

In Taylor v. First Advantage Background Services Corp., the district court concluded that the reasonableness of the CRA's procedures was a question for the jury. See 207 F. Supp. 3d 1095, 1107-1110 (N.D. Cal. 2016). The court distinguished Saenz, explaining that, "In [Saenz and another case] the CRA obtained information from the consumer's creditors, which were the actual and original sources of the information that the CRA was reporting. Here, by contrast, Defendant did not rely on information it obtained directly from the source of information regarding criminal convictions." Id. at 1109.

This case is similar to Saenz and Grigoryan, and unlike Taylor. Chex obtained information from BANA, the actual and original source of information that Chex was reporting. Horowitz has offered no evidence that Chex had reason to believe that BANA was not a reputable source of information. The evidence that Horowitz points to, such as Chex's alleged mishandling of the January 5 Letter, goes to Chex's duty to reinvestigate under § 1681i, not § 1681e(b). See Saenz, 621 F. Supp. 3d at 1081 (explaining that CRA's "duty to maintain reasonable accuracy-assuring procedures is codified separately and distinctly from the duty to conduct reasonable reinvestigation following a consumer dispute of credit report information"). Accordingly, the Court grants summary judgment in Chex's favor on Horowitz's § 1681e(b) claim.

### 4.    Chex's Reasonable Reinvestigation—§ 1681i

Section § 1681i obligates CRAs to reinvestigate disputes when the completeness or accuracy of an item has been challenged. See 15 U.S.C. § 1681i(a)(1)(A). The CRA must review and consider all relevant information submitted by the consumer, and promptly provide the credit grantor of the

disputed item with all relevant information regarding the dispute. See id. §§ 1681i(a)(2)(B), (a)(4). The CRA must then promptly delete or modify the item based on the results of the reinvestigation. See id. § 1681i(a)(5)(A).

In August 2021, Horowitz submitted a dispute to Chex, which sent BANA a request for reinvestigation. See Chex UF ¶ 26. BANA's response indicated that "Suspected fraud activity was placed by RISC department. Please contact RISC at 1-877-240-6886, Option 2." Id. ¶ 29. Sarah Cables, a business systems analyst for Chex, testified that BANA's response was sufficient according to Chex's procedures. See Kenney Decl. ¶ 6, Ex. 5, Deposition of Sarah Cables ("Cables Depo.") 39:9-41:1; 53:4-55:21; 76:15-77:3 ("Chex provided all the details regarding the consumer's dispute to [BANA] and requested that they verify the information to be accurate, which they did. Therefore, a follow-up was not required in this case."). In September 2022, Horowitz submitted another dispute to Chex, which sent BANA a request for reinvestigation. See Chex UF ¶¶ 45, 46. BANA verified the suspected fraud activity. See Cables Depo. at 74:16-78:15. Chex did not ask questions about the January 5 Letter because it referenced an account that was not in Chex's file. See id. at 78:3-15.

Horowitz argues that Chex's reinvestigations were unreasonable as a matter of law because they relied solely on the information provided by BANA. See Horowitz MSJ at 23-25. Chex contends that its reinvestigations, which carefully reviewed and considered Horowitz's two disputes and the information he submitted in support of them, were reasonable. See Chex MSJ at 18-21.

The heart of Chex's argument is that by providing BANA with relevant and accurate information, and then verifying BANA's response, it did all that was required under the statute. But it is well-settled that the FCRA's "reasonable reinvestigation" requirement mandates more than just verifying

the furnisher's information through automated procedures or superficial inquiries. See Grigoryan, 84 F. Supp. 3d at 1074-75 (collecting cases); see also Cushman v. Trans Union Corp., 115 F.3d 220, 225 (3d Cir. 1997) ("The 'grave responsibility' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources.").

Here, there are triable issues of fact with respect to the reasonableness of Chex's investigations of Horowitz's two disputes. In the first dispute, Horowitz claimed that he did not engage in suspect fraudulent activity because he did not stop payment on the check, Union Bank did. No evidence indicates that Chex did anything more than rely on BANA's response. See Cables Depo. at 39:9-41:1; 53:4-55:21; 76:15-77:3. A reasonable jury could infer that Chex's inaction rendered its investigation unreasonable. A reasonable jury could also find that Chex did all that was required of it under the FCRA.

In the second dispute, Horowitz sent Chex the January 5 Letter to demonstrate that BANA was inaccurately reporting him for engaging in suspected fraud activity. Again, there is no evidence that Chex took any action beyond forwarding that information to BANA and then fully crediting BANA's response. See Cables Depo. at 39:9-41:1; 53:4-55:21; 76:15-77:3. A reasonable jury could find that Chex's reinvestigation was unreasonable on this basis. See Saenz, 621 F.Supp.2d at 1084 ("Trans Union was provided with documentary evidence sufficient to place it on notice of the likelihood that NCO's information was inaccurate. A reasonable jury could infer from Trans Union's failure to provide NCO with copies or a summary of the evidence it received, or to conduct any independent consideration or investigation of Saenz' assertion that the balance had been paid, that the agency's reinvestigation was unreasonable."). A reasonable jury could also decide that Chex was not required to investigate further given that the letter included the wrong account number.

16

### 5.   Recovery for Business Losses

BANA and Chex contend that Horowitz's alleged damages for business losses are not recoverable under the FCRA. See BANA MSJ at 18-19; Chex MSJ at 21-22. Horowitz responds that he is entitled to damages for lost profits for businesses he was unable to open because the incorrect information prevented him from opening bank accounts for those businesses. See Horowitz BANA Opp'n at 18-19.

"While the FCRA expressly provides for 'actual damages' for a negligent or willful violation, [15 U.S.C.] §§ 1681n and 1681o also expressly provide that a violator is liable 'to that consumer.'" Boydstun v. U.S. Bank, 726 F. App'x 601 (9th Cir. 2018) (quoting Johnson v. Wells Fargo Home Mortg., Inc., 558 F. Supp. 2d 1114, 1122 (D. Nev. 2008)). "'In other words, Plaintiff must show Defendant's violation resulted in damages to Plaintiff as a consumer.'" Id. (quoting Johnson, 558 F. Supp. 2d at 1122). "A consumer, in turn, is defined by the FCRA as an individual—not a corporate entity." Id. (citing § 1681a(c)). As such, courts have concluded "that the FCRA does not apply where a consumer report is used to obtain credit for business purposes, as opposed to personal purposes." Dorian v. Community Loan Servicing, LLC, No. 22-4372, 2023 WL 395790, at *6 (N.D. Cal. Jan. 25, 2023) (citing cases).

Horowitz cites the Ninth Circuit's decision in Gorman, 584 F.3d 1147, to support the recovery of his business damages. There, the plaintiff submitted evidence that he was "refused credit or offered higher than advertised interest rates," had to "borrow money at inflated interest rates," and that he "lost wages from the time spent dealing with his credit problems." Id. The Ninth Circuit held that this was "sufficient to establish causation and damages." Id.

District courts have concluded that "[n]othing in the opinion indicates that Gorman sought to recover business damages, however, and nothing in the Ninth Circuit's opinion stands for the proposition that business damages are

recoverable in a FCRA or CCRAA action." Grigoryan, 84 F. Supp. 3d at 1084; see also Dorian, 2023 WL 395790, at *6-7 (concluding that plaintiff was precluded from bringing FCRA claims based on credit reports connected to rental properties but allowed as to refinancing of another property because plaintiff's in-laws resided there).

Having considered the statute and relevant case law, the Court agrees with those district courts who have concluded that business damages are not recoverable. As such, the Court grants summary judgment for Defendants on Horowitz's FCRA claim insofar as he seeks business loss damages.

### 6.    Recovery for Statutory or Punitive Damages

Statutory or punitive damages are awardable only if the FCRA violation is "willful." See 15 U.S.C. § 1681n(a). A "willful" violation under the FCRA includes "not only knowing violations of a standard, but reckless ones as well." Safeco Ins. Co. of Am, 551 U.S. at 57. "A defendant acts in reckless disregard if the defendant's action 'is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.'" Bateman v. American Multi–Cinema, 623 F.3d 708, 711 n. 1 (9th Cir. 2010) (quoting Safeco, 551 U.S. at 69). "That is, the defendant must have taken action involving 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" Id. (quoting Safeco, 551 U.S. at 68). "Willfulness under the FCRA is generally a question of fact for the jury." Edwards v. Toys "R" Us, 527 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007).

Horowitz asserts that BANA's violations were willful because its policy of performing reinvestigations only if presented with "new information" contradicts the plain language of the statute, and because BANA disregarded critical and obvious information. See Horowitz MSJ at 20-21. Further, he asserts that Chex's violations were willful because it merely parroted

18

information received from BANA and ignored obvious evidence. See id. at 24-25. BANA and Chex argue that Horowitz has, at best, shown negligence. See BANA MSJ at 17-18; Chex MSJ at 22.

Triable issues of fact remain with respect to this issue. Given the above evidence, a reasonable jury could find that BANA and Chex's investigations were so deficient that they created an unjustifiably high risk of harm so obvious that it should have been known. See Taylor, 207 F. Supp. 3d at 1111-13 (finding that reasonable jury could determine that defendant acted with reckless disregard in conducting its reinvestigation where evidence supported that CRA's policies did not address specifics of individual disputes). A reasonable jury could also conclude that BANA and Chex's errors, if any, were merely negligent.

**B.     Promissory Estoppel**

BANA argues that it is entitled to summary judgment on Horowitz's claim for promissory estoppel. See MSJ at 20-24. "Under California law, the elements of promissory estoppel are (1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) the reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." Sateriale v. R.J. Reynolds Tobacco Co., 697 F.3d 777, 792 (9th Cir. 2012); see also U.S. Ecology, Inc v. State, 129 Cal. App. 4th 887 (2005).

**1.     Promise**

BANA argues that the January 5 Letter was a "mere statement of fact about a past event," not a promise of future performance. See BANA MSJ at 21-22. Horowitz responds that California has adopted the Restatement (Second) of Contracts doctrine of promissory estoppel, which employs equitable principles and binds a promissor "when he should reasonably expect a substantial change of position, either by act or forbearance, in reliance on his

promise, if injustice can be avoided only by its enforcement." Horowitz BANA Opp'n at 19 (citing <u>Jones v. Wachovia Bank</u>, 230 Cal. App. 4th 935, 944 (2014)).

BANA's January 5 Letter told Horowitz that BANA had "submitted a request" to Chex to "remove the reporting from your credit file" and that Horowitz "can use this letter as documentation that the request has been submitted." Chex UF ¶ 35. Viewing this evidence in the light most favorable to Horowitz, a reasonable jury could find that BANA made a clear and unambiguous promise on which Horowitz relied. The Court is not persuaded by BANA's contention that statements in the past tense cannot be promises.

### 2.  Substantial Detriment

After receiving BANA's letter, Horowitz attempted to open a bank account at NuVision Federal Credit Union, but he was turned down due to the negative reporting. <u>See</u> Chex UF ¶ 44. BANA argues that Horowitz's time spent "fruitlessly attempting to open accounts at a single financial institution is not a sufficiently substantial detriment" to support an estoppel claim. <u>See</u> BANA MSJ at 22-23.

Viewing the evidence in the light most favorable to Horowitz, a reasonable jury could find that his experience with NuVision constituted a substantial detriment. Additionally, BANA's argument is not well taken. After NuVision turned Horowitz down, it was clear that he would be unable to open an account at any financial institution while the negative reporting continued. Horowitz was not required to repeatedly subject himself to embarrassment for the sake of establishing reliance.

### 3.  Emotional Distress and Business Losses

BANA argues that Horowitz's estoppel claim falls within the general rule that damages for mental suffering and emotional distress are not recoverable in a contract action. <u>See</u> BANA MSJ at 23-24. Horowitz responds

that those damages are available because BANA's conduct directly affected his comfort, happiness, and personal welfare. See Horowitz BANA Opp'n at 21-22.

"[D]amages for mental suffering and emotional distress are generally not recoverable in an action for breach of an ordinary commercial contract in California." Erlich v. Menezes, 21 Cal. 4th 543, 558 (Cal. 1999) (citations omitted). However, "when the express object of the contract is the mental and emotional well-being of one of the contracting parties, the breach of the contract may give rise to damages for mental suffering or emotional distress." Id. at 559.

Here, Horowitz has not set forth any evidence to suggest that the express object of BANA's January 5 Letter was Horowitz's mental and emotional well-being. At most, Horowitz has established that BANA's conduct impacted his well-being, which is not sufficient.

Next, BANA argues that Horowitz's alleged lost business profits and opportunities are special damages for which he cannot recover. See BANA MSJ at 24-25. Horowitz responds that BANA was "keenly aware" of the damages that he would incur due to BANA's failure to honor its promise. See Horowitz BANA Opp'n at 21-22.

Special damages "are secondary or derivative losses arising from circumstances that are particular to the contract or to the parties," and are limited to "losses that were either actually foreseen . . . or were reasonably foreseeable when the contract was formed." Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist., 34 Cal. 4th 960, 968 (2004) (cleaned up); see also Cooper v. State Farm Mut. Auto. Ins. Co., 177 Cal. App. 4th 876, 899 (2009) (explaining that special damages are recoverable when, at the time of contract formation, the breaching party knew or should have known of the special circumstances).

Viewing the evidence in the light most favorable to Horowitz, there is no genuine issue of material fact as to whether BANA had reason to foresee that failing to remove the negative information could cost Horowitz future business opportunities. It is undisputed that the disputes Horowitz submitted to Chex do not mention anything regarding Horowitz's business or potential business losses. See Chex UF ¶¶ 26, 45. The fact that BANA was generally engaged in commercial lending and had closed Horowitz's personal and business accounts is not sufficient to preclude summary judgment. See Highwire Promotions, LLC v. Legend Marketing LLC, 263 F. App'x 564, 564-66 (9th Cir. Jan. 10, 2008) (concluding that supplier's general knowledge of the importance of timely delivery and "business experience" was not enough to deny summary judgment).

## C.    Fraud

BANA argues that it is entitled to summary judgment on Horowitz's claim for fraud. See BANA MSJ at 25-28. "The elements of a cause of action for fraud in California are: '(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'" Kearns v. Ford Motor Co., 567 F.3d 1120, 1126 (9th Cir. 2009) (quoting Engalla v. Permanente Med. Group, Inc., 15 Cal. 4th 951, 974 (Cal. 1997)).

BANA argues there is no competent evidence that it had any intent to defraud Horowitz. See MSJ at 25. Horowitz responds that this is a question of fact because BANA's January 5 Letter could have been mailed after Battle declined Herington's request to remove the negative reporting. See Horowitz BANA Opp'n at 22-23. If so, argues Horowitz, BANA knew the January 5 Letter was false. See id.

22

The Court agrees with BANA. "The representation must be made with the intent to defraud the plaintiff, that is, to induce his or her reliance." See 5 Witkin, Summary 11th Torts § 922 (2023). Even assuming BANA's January 5 Letter contained misrepresentations, Horowitz has not come forward with any direct or circumstantial evidence that BANA intended to defraud him. It is undisputed that Herrington's request was sent to Battle, who denied it because it referenced an account ending in 6566, not out of any animosity toward Horowitz. See Chex UF ¶¶ 40, 41. Battle's rejection should have generated an automatic email to Herrington, but she did not receive anything. See id. ¶¶ 42, 43. Additionally, Horowitz has not offered any evidence to allow the inference that BANA had a reason to make false statements in the January 5 Letter. Cf Lovejoy v. AT&T Corp., 119 Cal. App. 4th 151, 160-61 (2004) (finding an inference of an intent to defraud where defendant could have acted "for the purpose of making a profit"). When the letter was sent, Horowitz's BANA accounts were permanently closed.

## IV.    CONCLUSION

Horowitz's Motion for Summary Judgment is DENIED.

BANA's Motion for Summary Judgment is GRANTED as to Horowitz's alleged business losses under the FCRA, his alleged emotional distress and business losses under his promissory estoppel claim, and his claim for fraud. BANA's Motion is otherwise DENIED.

Chex's Motion for Summary Judgment is GRANTED as to Horowitz's alleged business losses under the FCRA and his claim for violation of § 1681e(b) of the FCRA. Chex's Motion is otherwise DENIED.

Date: April 4, 2024

_____
DOUGLAS F. McCORMICK
United States Magistrate Judge

23